UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.:

ROSEMARIE OBREMSKI as personal
representative of the Estate of
STEPHEN OBREMSKI, Deceased,

Plaintiffs,

v.

ARMOR CORRECTIONAL HEALTH SERVICES,
INC., a Florida corporation, and;
SCOTT ISRAEL, in his official capacity
as Sheriff of Broward County, Florida, and;
STANLEY FRANKOWITZ D.O.,
R.N. JERI MONICAL,
R.N. CYNTHIA MCDONALD,
LPN MARVA PARKE,
R.N. TRACY SPENCE,
R.N. KUMAR MOWATT,
R.N. KATHLEEN MILLS,
R.N. ASTOR KERR
R.N. MAUREEN DORCELY
JERRY BURGESS, Jr. MD, each individually and
as employees of ARMOR CORRECTIONAL
HEALTH SERVICES, INC.

Defendants.

_____/

## **COMPLAINT**

The Plaintiff, ROSEMARIE OBREMSKI, as personal representative of the Estate

of STEPHEN OBREMSKI, Decedent, on behalf of herself as the surviving spouse, Mr.

OBREMSKI'S estate and on behalf of their two minor children Daniel Obremski and

Stephen Obremski Jr., sues Defendants, jointly and severally, and alleges:

1

## PRELIMINARY STATEMENT

1.      Stephen Obremski, Scott Burrell, and April Farrah all died horrible and preventable deaths in Defendant SCOTT ISRAEL's North Broward Bureau jail (hereinafter NBB) in April and May of 2016.  After an investigation, Defendant Armor Correctional Health Svcs., Inc., (hereinafter ARMOR) concluded that these three inmates died because they were not promptly transferred to an outside hospital for care.  (Ex. 1. – Four-page document regarding the deaths and findings on page four).  These three deaths are not some anomaly, but the continuation of a consistent pattern of deliberate indifference on the part of ARMOR, its employees, and Broward Sheriff's Office (hereinafter BSO) that is both morally and legally indefensible.

2.      The unconstitutional healthcare provided by ARMOR results from ARMOR'S profit motivated cost-cutting and is enabled by BSO'S lack of oversight.  This combination has resulted in at least ten horrible and preventable deaths since 2011, including those listed below, which will be fully described later in this complaint:

      a.  February 17, 2011, William Campbell, a mentally ill man who had been arrested for DUI, died of sepsis;

      b.  October 10, 2011, Gary Joseph Smith, a mentally ill man who had been arrested for possession of cocaine, died of pneumonia;

      c.   January 3, 2012, Calvin Goldsmith, a mentally ill man who had been arrested for trespassing, died of sepsis;

      d.  July 7, 2012, Mr. Sacco, a mentally ill man who was arrested for a

2

misdemeanor, died from sepsis;

e.  July 10, 2012, Mr. Priester, a severely mentally ill man, was found dead in his cell. He had lost 120 pounds during his 155 days in jail and died from starvation;

f.  December 24, 2012, William Herring Jr., a severely mentally ill man, who was arrested when sleeping on a bus bench died from starvation;

g.  January 7, 2015, Simon Valacheryil, a mentally ill man died from a gastrointestinal bleed and infectious pericarditis;

h.  April 1, 2016, Scott Burrell, a mentally ill man died of peritonitis from a bowel perforation;

i.  April 5, 2016, Stephen Obremski, a mentally ill man who had been arrested for a DUI died from a gastrointestinal hemorrhage;

j.  May 16, 2016, April Farrah, a mentally ill woman who had been arrested for having an open container of beer died from a gastrointestinal hemorrhage.

3.     Since 2004 BSO has paid ARMOR approximately $350,000,000.00 based on a fundamentally flawed contract with perverse incentives for ARMOR and equally perverse disincentives for BSO. The flaws in the contract are that ARMOR is paid a flat fee of $25,000,000 per year to provide all healthcare within the Broward County Jail system. Therefore, because this is a flat fee, ARMOR is incentivized to reduce costs by offering as little care as possible so as not to reduce its flat fee amount. Simultaneously, ARMOR has agreed to completely indemnify BSO as well as pay BSO's legal fees and any civil judgments that arise from the provision of healthcare in the jails. This thereby *dis*incentivizes BSO

3

from exercising robust oversight of ARMOR because BSO has no financial skin in the game. The predictable and tragic result of this combination of incentives and disincentives is unnecessary injury and death.   (Exhibit 2.  Contract 2014-2017 at pages 33-34, 45-46).

## JURISDICTION

4.      Counts 1 - 12 of this action are brought pursuant to 42 U.S.C. §1983, and the Fourteenth Amendments to the United States Constitution as Mr. Obremski was a pretrial detainee at all relevant times.  Jurisdiction is based upon 28 U.S.C. §1331, §1343, and 42 U.S.C. § 1983 and §1988.

5.      Counts 13 - 25 are based on state law negligence and in each state law count the Plaintiff claims damages well in excess of the jurisdictional threshold amount of $15,000.00.

6.      The federal violations were committed as a result of the deliberate indifference of all of the Defendants.

7.      The acts and practices constituting the violations alleged below have occurred within the jurisdiction of the United States District Court in and for the Southern District of Florida. In connection with the acts, practices, and violations alleged herein, each Defendant has, directly or indirectly, violated the constitutional rights of Mr. Obremski.

8.      All conditions precedent under Florida law to the filing of this lawsuit have been satisfied.

         a.   Plaintiff has put all governmental entities on notice as required by § 768 of
              the Florida Statutes.

         b.   Plaintiff complied with all pre-suit medical malpractice procedures as

4

required by Chapter 766 of the Florida Statutes.  The Defendants responded

to Plaintiff's Notice of Intent to sue between April 9, 2018, and June 11,

2018.

9.      On March 21, 2018, the undersigned obtained a 90-day extension of the statute of

limitations under statue 766.104(2) in Broward County Circuit Court under case number

18005916.

10.     The above-listed claimants, through the Personal Representative, seek an award of

damages for mental and emotional injuries, funeral expenses, punitive damages, court costs

and attorney fees. The Personal Representative of the Estate of Mr. Obremski also claims

survival damages under Section 46.021, Florida Statutes, as Mr. Obremski suffered past

physical, mental, emotional pain and suffering, and loss of enjoyment of life when he was

held in the Broward County Jail.

## PARTIES

11.      Mr. Obremski and his Personal Representative, at all times material hereto, have

been residents of Broward County, Florida.

12.     The Defendant, SCOTT ISRAEL, (hereinafter ISRAEL or BSO) is the Sheriff of

Broward County.  Said Defendant is responsible, as Sheriff, for the conduct of ARMOR and

its employees as he has retained ARMOR to provide medical care for all inmates in the

Broward County Jail.

13.     The Defendant ARMOR CORRECTIONAL HEALTH SERVICES, INC.,

(hereinafter ARMOR) is a Florida Corporation, organized and existing under the laws of the

State of Florida, conducting business in Broward County, Florida.

14.     The Defendant STANLEY FRANKOWITZ D.O. (hereinafter FRANKOWITZ) at all times material herein, was employed by and serving under Defendant ARMOR.  Said Defendant is being sued in his individual capacity.

15.     The Defendant RN JERI MONICAL (hereinafter MONICAL) at all times material herein, was employed by and serving under Defendant ARMOR.  Said Defendant is being sued in her individual capacity.

16.     The Defendant RN CYNTHIA MCDONALD (hereinafter MCDONALD) at all times material herein, was employed by and serving under Defendant ARMOR.  Said Defendant is being sued in her individual capacity.

17.     The Defendant LPN MARVA PARKE (hereinafter PARKE) at all times material herein, was employed by and serving under Defendant ARMOR.  Said Defendant is being sued in her individual capacity.

18.     The Defendant RN TRACY SPENCE (hereinafter SPENCE) at all times material herein, was employed by and serving under Defendant ARMOR.  Said Defendant is being sued in her individual capacity.

19.     The Defendant RN KUMAR MOWATT (hereinafter MOWATT) at all times material herein, was employed by and serving under Defendant ARMOR.  Said Defendant is being sued in his individual capacity.

20.     The Defendant RN KATHLEEN MILLS (hereinafter MILLS) at all times material herein, was employed by and serving under Defendant ARMOR.  Said Defendant is being sued in her individual capacity.

21.     The Defendant RN ASTOR KERR (hereinafter KERR) at all times material herein, was employed by and serving under Defendant ARMOR.  Said Defendant is being sued in

his individual capacity.

22. The Defendant RN MAUREEN DORCELY (hereinafter DORCELY) at all times
    material herein, was employed by and serving under Defendant ARMOR.   Said
    Defendant is being sued in her individual capacity.

23.  The Defendant Jerry Burgess, MD (hereinafter Burgess) at all times material herein,
    was employed by and serving under Defendant ARMOR.  Said Defendant is being sued
    in his individual capacity.

24.    At all times material hereto, and in all their acts described herein, the Defendants
    were acting under color of state law and color of their authority as public officials, public
    employees or employees of ARMOR.

25.    The wrongful actions of the Defendants constituted deliberate indifference to Mr.
    Obremski's s serious medical condition and caused his death.


## ALLEGATIONS OF FACTS

26.    On March 22, 2016, Stephen Obremski (hereinafter Mr. Obremski) was arrested for
driving on a suspended license and booked into the Broward County Jail.  He was 54 years
old at the time.

27.    At intake, Armor's employees documented that Mr. Obremski suffered from a seizure
disorder and had a history of mental illness and suffered aserious brain injury from a
motorcycle accident in which he lost his left leg below the knee.   At this time ARMOR's
employees concluded that Mr. Obremski was physically healthy and psychologically stable.

28.    On March 23, 2016, Mr. Obremski was transferred to the infirmary at the North
Broward Bureau (NBB), and Defendant Frankowitz became his primary care physician.  Mr.

Obremski was placed into isolation cell number 4.

29.     On March 23, 2016, Defendant Frankowitz evaluated Mr. Obremski and found him to be alert and orientated to person, place and time.  Frankowitz started Mr. Obremski on 500mg of Naprosyn (a non-steroidal anti-inflammatory) to be taken twice per day.

30.     On March 24, 2016, Mr. Obremski was evaluated by Monical who documented that Mr. Obremski had deteriorated and was now very confused and hallucinating.  Monical failed to provide any care, treatment or alert any other medical provider about her patient's deterioration.

31.      On March 24, 2016, Frankowitz reevaluated Mr. Obremski and found that his condition had deteriorated and he was now only oriented to person and could no longer identify where he was or the day or year.

32.     On March 25, 2016, at 12:30 am, McDonald examined Mr. Obremski and documented that he was laying on the ground experiencing significant tremors, was disorientated and unable to follow simple commands.  McDonald failed to provide any care, treatment or alert any other medical provider about her patient's deterioration.

33.     On March 25, 2016, at 7:55 am, Mr. Obremski had a major seizure and fell to the floor lacerating his forehead leaving a wound that was visible at autopsy on 4/6/16.  The fall and seizure also bloodied his nose and injured his chin.  Frankowitz was present immediately after Mr. Obremski's seizure and realized that Mr. Obremski was critically ill and needed to be transferred to an outside hospital for care.  However, Frankowitz and Armor's other medical providers failed to have Mr. Obremski transferred to a hospital and instead left him on the floor of his isolation cell.

34.     On March 25, 2016, hours after the seizure, Frankowitz reevaluated Mr. Obremski and found him face down on the floor.  He provided no care or treatment to address Mr.

Obremski's serious medical need.  Before reevaluating Mr. Obremski, Frankowitz reviewed Mr. Obremski's hospital medical records from the month prior.  Frankowitz made handwritten notes in these records and underlined that Mr. Obremski suffered from cirrhosis and esophageal varicies.  Based on this information no reasonable medical provider would have given Mr. Obremski non-steroidal anti inflammatories.  Non-steroidal anti-inflammatories are known to cause gastrointestinal bleeding in people with cirrhosis and esophageal varices.  However, Frankowitz did not change his medication order from 3/23/16 wherein he had ordered that Mr. Obremski be given 500mg of Naprosyn twice a day for 15 days.  This caused or substantially contributed to the gastrointestinal bleed that killed Mr. Obremski.

35.     On March 25, 2016, hours after the seizure, Kerr observed that Mr. Obremski was lying on the floor convulsing.  Mr. Obremski was disoriented and unable to follow simple verbal commands.  Kerr failed to provide any care, treatment or alert any other medical provider about her patient's deterioration.

36.     On March 26, 2016, McDonald reevaluated Mr. Obremski and found him lying on the floor convulsing.  She recorded that Mr. Obremski said, "help me."  She documented that Mr. Obremski was disoriented as to place and time.  McDonald recognized that her patient had deteriorated since she last saw him but she failed to alert any doctor, provide any aid or have Mr. Obremski transferred to a hospital for care.

37.     On March 26, 2016, Dorcely evaluated Mr. Obremski and found him prone on the floor convulsing.  She documented that he was muttering incoherently and that his condition was worsening.  However, she failed to provide any aid, alert any other providers about Mr. Obremski's deterioration or have him transferred to an outside hospital.

38.     On March 26, 2016, Kerr found Mr. Obremski lying face down on the floor

convulsing and he moved him back to his bed but failed to alert any medical provider about Mr. Obremski's worsening condition, provide any care or have Mr. Obremski transferred to an outside hospital for care.

39.     On March 27, 2016, Mills found Mr. Obremski face down on the floor convulsing. She failed to provide any aid or alert any other provider about Mr. Obremski's emergency medical condition.

40.     On March 27, 2016, Kerr documented that he found Mr. Obremski lying the floor convulsing and totally incoherent.  Again, Kerr failed to provide any aid or alert any other Armor medical employee about Mr. Obremski's emergent medical condition.

41.     On March 28, 2016, Frankowitz reevaluated Mr. Obremski and documented that he was convulsing.  Again, Frankowitz references the records from the outside hospital that identified that Mr. Obremski had cirrhosis and esophageal varices and again Frankowitz failed to take Mr. Obremski off the non-steroidal anti-inflammatories that he had ordered. Frankowits again failed to provide any care or treatment designed to address Mr. Obremskis' serious medical needs.

42.     On March 28, 2016, Mowatt documented that Mr. Obremski was confused and hallucinating.  Mowatt failed to provide any medical care, alert any other medical provider about Mr. Obremski's emergent medical condition or have Mr. Obremski transferred to a hospital.

43.     On March 29, 2016, McDonald found Mr. Obremski laying on the floor convulsing and mumbling incoherently.  She failed to provide any medical care, alert any medical provider about Mr. Obremski's serious medical condition or have him transferred to an outside hospital for care.

44.     On March 29, 2016, Mowatt found Mr. Obremski visibly convulsing and incontinent.

10

Mowatt documented multiple discolored wounds on Mr. Obremski's arms and legs.  These wounds were infected lesions that poisoned Mr. Obremski's blood and caused the sepsis that caused or substantially contributed to his death.  Mowatt also documented that Mr. Obremski had defecated on himself.  Mowatt placed Mr. Obremski in a diaper.  Mowatt failed to provide any medical treatment for these medical needs or alert any other medical provider about these serious medical conditions or have Mr. Obremski transferred to an outside hospital for care.

45.     On March 30, 2016, Mowatt reevaluated Mr. Obremski who was prone the floor convulsing.  Mowatt noted discolored and infected wounds on Mr. Obremski's torso and limbs.  He also documented that Mr. Obremski had again defecated on himself.  Mowatt failed to provide any medical aid, alert any other medical provider of his findings or have Mr. Obremski transferred out to an outside hospital for what he identified as a medical emergency.

46.     On March 31, 2016, Frankowitz reviewed the prior medical notes identified that Mr. Obremski was incontinent, confined to the floor convulsing and disoriented.  Frankowitz examined Mr. Obremski and documented the various infections on his body.  However, he failed to have Mr. Obremski transferred to an outside hospital for what he realized was a medical emergency.

47.     On March 31, 2016, Kerr found Mr. Obremski face down on the ground, confused with incoherent speech and in a diaper that was soiled with urine and feces.  Kerr failed to provide any medical care or have Mr. Obremski moved to an outside hospital for what he identified as a medical emergency.

48.     On April 1, 2016, Frankowitz reviewed Mr. Obremski's updated lab results.  Defendant FRANKOWITZ realized that the results were critically abnormal and showed that

Mr. Obremski had a severe infection and dehydration. The lab results provided FRANKOWITZ objective evidence that Mr. Obremski was medically critical and would die without real medical intervention which could not be provided in the jail. Mr. Obremski's White Blood Count (WBC) was 18,300 indicating that his body was fighting an infection (normal WBC range is 3,600-11,000). At this point, Defendant FRANKOWITZ had in addition to the lab results, the evidence from his evaluations of Mr. Obremski and all the documentation in the chart which confirmed that Mr. Obremski was dying and in need of hospitalization. However, FRANKOWITZ failed to treat Mr. Obremski or have him transferred to an outside hospital for care.

49. On April 1, 2016, after Franowitz reviewed Mr. Obremski's lab results, he evaluated Mr. Obremski and documented that Mr. Obremski was disheveled, incontinent of urine and feces, wearing an adult diaper, was dehydrated and suffering from prerenal azotemia due to volume depletion. Prerenal azotemia will result in kidney failure if not quickly corrected. Frankowitz failed to provide any medical care or have Mr. Obremski transferred to hospital for treatment of his serious medical needs.

50. On April 1, 2016, Kerr found Mr. Obremski lying face down on the floor of his cell still incontinent and in a diaper. Mr. Obremski requested that he be given his crutches. Kerr documented that Mr. Obremski's infected leg was red and swollen. However, he failed to provide any medical care or alert any other medical providers for what he identified as an emergency or have Mr. Obremski transferred to an outside hospital for care.

51. On April 2, 2016, McDonald examined Mr. Obremski and documented that he was convulsing and did not know that he was in jail. McDonald failed to provide any medical care, alert any other medical providers about her patient's worsening condition or have Mr. Obremski transferred to an outside hospital for care.

52.     On April 2, 2016, Spence evaluated Mr. Obremski and found him lying on the floor of his cell with a swollen and infected left arm and right knee.  Mr. Obremski was complaining of pain.  Spence understood that Mr. Obremski's condition was an emergency however she failed to have him transferred to an outside hospital or alert any Armor medical provider about Mr. Obremski's serious medical conditions.

53.     On April 2, 2016, Parke evaluated Mr. Obremski.  She found Mr. Obremski lying on the floor moaning and in a diaper.  Parke documented that Mr. Obremski's left arm, right knee were and outside of his right foot were infected, painful, swollen and the skin appeared blotchy.  All these infected lesions are visible on the autopsy photos.  Parke was aware that Mr. Obremski's condition was an emergency however she failed to provide any care, have him transferred to an outside hospital or alert any Armor medical provider about Mr. Obremski's serious medical needs.

54.     On April 3, 2016, Monical reevaluated Mr. Obremski and documented that he had tremors and that he stated he was, "not doing well."   Monical observed active and progressively worsening infections on Mr. Obremski's body.  Monical was aware that Mr. Obremski's condition was deteriorating and that without medical care he would die.  However, she failed to provide any care, request that someone else provide care or have Mr. Obremski transferred to a hospital.

55.     On April 3, 2016, Parke reevaluated Mr. Obremski and found him to be confused and incontinent.  Parke documented that Mr. Obremski's infected limbs were worsening and were becoming more swollen, blotchy and that red spots were moving out from the site of the infections.  Parke is aware that Mr. Obremski's condition was deteriorating and that without medical care he would die.  However, she failed to provide any care, request that someone else provide care or have Mr. Obremski transferred to a hospital.

13

56.     On April 4, 2016, at 12:25 am Mr. Obremski was reevaluated by McDonald who found him on the floor in a diaper.  McDonald documented that Mr. Obremski was only oriented to person, meaning that he did not know where he was or the day or year.  McDonald documented that the infections on Mr. Obremski's left arm, left hip, right leg stump, and right wrist had become more infected and swollen since she had last seen him.   McDonald is aware that Mr. Obremski's condition was deteriorating and that without medical care he would die.  However, she failed to provide any care, request that someone else provide care or have Mr. Obremski transferred to a hospital.

57.     On April 4, 2016, at 12:34 pm Mr. Obremski was seen by Burgess.  Before evaluating Mr. Obremski, Burgess reviewed the medical chart and was aware of Mr. Obremski's worsening infections, dehydration, seizures, incontinence and altered mental state.  Based on his examination Burgess documented that Mr. Obremski was only oriented as to person meaning that he did not know where he was or the day or year.  Burgess was aware that Mr. Obremski's condition was deteriorating and that without medical care he would die.  However, he failed to provide any care, request that someone else provide care or have Mr. Obremski transferred to a hospital.

58.   On April 4, 2016, at 4:35 pm, Mr. Obremski was reevaluated by Mowatt.  Mowatt described Mr. Obremski as disoriented and only able to respond to his name.  Mr. Obremski was still in a diaper and still had visible tremors.  Mowatt documented several severe infections on Mr. Obremski body including his right wrist, right hip, right knee stump, right lateral side of his right foot, left elbow, left wrist and his chest.  Mowatt describes Mr. Obremski as pale and jaundiced.  (Jaundice is a medical condition with yellowing of the skin or whites of the eyes, arising from excess of the pigment bilirubin and typically caused by obstruction of the bile duct, by liver disease, or by excessive breakdown of red blood cells).  Mowatt was aware that

14

Mr. Obremski's condition was deteriorating and that without medical care he would die. However, he failed to provide any care, request that someone else provide care or have Mr. Obremski transferred to a hospital.

59. On April 4, 2016, at 5:10 pm Mowatt contacted either Frankowitz or Burgess by phone regarding Mr. Obremski's deteriorating medical condition.  Mowatt was told not to transfer Mr. Obremski to the hospital and was not ordered to provide any treatment.  Mowatt was aware that Mr. Obremski would die shortly without care at a hospital, but he chose to differ to either Frankowitz or Burgess who had exhibited that they had no interest in providing the necessary care.

60. On April 4, 2016, at 8:40 pm, Mowatt again called either Frankowitz or Burgess and was permitted to transfer Mr. Obremski to the hospital.

61. When Mr. Obremski arrived at the hospital, he was moribund and could not be saved.  He died before midnight on April 4, 2016.

62.  Based on ARMORS review of Mr. Obremski's death Defendant FRANKOWITZ was fired. ARMOR's policymakers concluded that Defendant FRANKOWITZ failed to send Mr. Obremski to an outside hospital for care and treatment in a medically appropriate manner.  (Ex. 1 at pg. 4)

### EXAMPLES OF OTHER SIMILAR INMATE DEATHS IN THE BROWARD COUNTY JAIL THAT SHOW THE CUSTOM & ARMOR'S HISTORY OF DELIBERATE INDIFFERENCE

#### William Campbell:

63.     On February 5, 2011, William Campbell was arrested for DUI.  He was booked into the Broward County Jail and evaluated by ARMOR'S medical staff.

15

64.     On February 6, 2011, at 10:00 A.M. William Campbell became hypotensive with a blood pressure of 63/37.  Defendant FRANKOWITZ was contacted, made aware of this serious medical condition and failed to have Mr. Campbell transported to the hospital when hospitalization was necessary due to a medical emergency.

65.     On February 6, 2011, at 4:00 P.M. William Campbell was found on the floor and incontinent of feces. Mr. Campbell was evaluated at this time by ARMOR employee Pat Janis and found to be still hypotensive with a blood pressure of 75/47, a fever of 102.5, a pulse of 106 with increasing ataxia (the loss of full control of bodily movements) and confusion.

66.     On February 7, 2011, at 8:00 A.M. William Campbell was evaluated by Defendant FRANKOWITZ and transferred to the hospital where he later died.

67.     An autopsy was conducted and the medical examiner concluded that "sepsis was a factor contributory to death."

68.     On February 22, 2011, ARMOR drafted a three-page document called a "Mortality or Morbidity Review."     This review outlines the medical care that was provided and memorializes ARMOR'S conclusions regarding whether the medical care was appropriate. In the case of William Campbell, ARMOR concluded that the:

> "Patient's vital signs and conditions were deteriorating.  He was in early shock with symptoms consistent with SIADH Na+119.  IV fluid and p.o. antibiotics were not appropriate amount or route to arrest deterioration. **The decision to obtain a higher level of care was delayed at least 24 hours**."

69.     The Mortality or Morbidity Review relating to William Campbell was reviewed at a meeting on February 23, 2011, that was attended by ARMOR'S regional vice president,

Health Services Administrator, medical director and director of nursing as well as eight other high-ranking ARMOR employees. Therefore, ARMOR and BSO through their policymakers were aware of the problems outlined above in the care of William Campbell including that the decision to transfer him to an outside hospital was delayed at least 24 hours. However, ARMOR or BSO failed to take any corrective action to prevent future deaths.

**Gary J. Smith:**

70.     On August 4, 2011, Gary Smith was arrested for possession of cocaine and booked into the Broward County Jail. ARMOR though its employees, including FRANKOWITZ, discovered that Mr. Smith had full-blown AIDS with a CD4 of 136 and viral load of 300,000 (a CD4 count below 200 is recognized as the threshold level when a person who is HIV+ is considered to have AIDS and when HIV or AIDS is properly managed the viral load will be zero). However, no ARMOR employee, including FRANKOWITZ, made any attempt to place Mr. Smith on any antiretroviral medication that would have decreased his viral load and increased his CD4. As expected, Mr. Smith's health deteriorated and he was moved to the infirmary after an acute episode of shortness of breath. Instead of transferring Mr. Smith to an outside hospital for care and treatment of his serious medical conditions, ARMOR kept Mr. Smith inside the jail infirmary where he became dehydrated and suffered from acute renal failure with metabolic encephalopathy.

71.     On October 8, 2011, Gary Smith, while in FRANKOWITZ'S infirmary, became incontinent of urine and had persistent garbled speech. ARMOR'S medical personnel were aware of the medical history as outlined above but still ignored a clear medical emergency and failed to transport Mr. Smith to an outside hospital that could have provided the level of

care that he needed.

72.    On October 9, 2011, at 5 P.M. Gary Smith deteriorated to the point where he became unresponsive. Mr. Smith was transported to the hospital where he coded before he was admitted to the Intensive Care Unit. Hospital employees revived Mr. Smith and placed him on a ventilator. On October 10, 2011, Mr. Smith coded again and was not able to be revived. His time of death was 7:52 AM on October 10, 2011.

73.    An autopsy was conducted and the cause of death was "acute lobar pneumonia with a clinical history of low CD4 count and acute renal failure and dehydration".

74.    ARMOR drafted a "Mortality or Morbidity Review" after Mr. Smith's death. The review concluded that when Mr. Smith became dehydrated, a more aggressive rehydration treatment was necessary, but not provided. ARMOR'S regional vice president, medical director, director of nursing, BSO Captain Callaghan and nine other high-ranking ARMOR employees reviewed this report on January 11, 2012. Therefore, ARMOR and BSO were aware of the constitutional deficiencies in Mr. Smith's care. However, they failed to make any changes to prevent this type of unnecessary death from recurring in the future.

**Calvin Goldsmith:**

75.    On December 18, 2011, Calvin Goldsmith was arrested for trespassing and booked into the Broward County Jail.

76.    On December 22, 2011, Calvin Goldsmith became critically ill and fell in his cell several times striking his head, causing several facial lacerations. ARMOR personnel moved Mr. Goldsmith to the infirmary where he became agitated and critically hypotensive (low blood pressure).

18

77.     According to ARMOR'S medical records over the next few days Mr. Goldsmith continued to deteriorate, and on December 24, 2011, he was found in his cell, lying on the floor too weak to move and covered in feces.  Defendant FRANKOWITZ was notified and apprised of the situation.  Faced with this clear medical emergency of a man deteriorating and dying in their infirmary ARMOR through its employees, including Defendant FRANKOWITZ, failed to transfer Mr. Goldsmith to the hospital when it was necessary and obvious that he required emergency medical care.

78.     On December 26, 2011, two days after Mr. Goldsmith was found lying on the floor in his feces to weak and sick to move, he was reevaluated by ARMOR'S medical personnel and found to be moaning, gurgling, dehydrated and in shock.  He was then transferred to the hospital where he died.

79.     ARMOR conducted a "Mortality or Morbidity Review" relating to the death of Calvin Goldsmith and concluded that Mr. Goldsmith was suffering from decreasing blood pressure, altered mental status, was moaning and that the provider (FRANKOWITZ) was aware of this and it appears that nothing was done.  The medical care of Mr. Goldsmith and the "Mortality or Morbidity Review" was discussed at a meeting held on January 11, 2012 – the same day that the same group reviewed the "Mortality or Morbidity Review" for Gary Smith as outlined above.  This meeting was attended by ARMOR'S regional vice president, medical director, director of nursing, health services administrator and five other high-ranking ARMOR employees. Therefore, ARMOR and BSO was aware of the constitutional deficiencies in the care of Mr. Goldsmith and even with this knowledge failed to make any changes that would prevent unnecessary deaths in the future.

**Raleigh Priester – Case Number: 14-61577-CIV-BLOOM (Southern Dist. of Florida)**

80.     On February 6, 2012, Raleigh Priester, a United States Army veteran, who had battled severe mental health problems, including schizophrenia, for over two decades was arrested for throwing a rock at a City of Fort Lauderdale employee who had asked him to vacate a city parking garage.   According to booking records from the Broward County Jail, Mr. Priester was 6 foot 2 inches tall and weighed 240 pounds the day he was arrested.

81.     From February 6, 2012 to May 22, 2012, Mr. Priester was locked in a single man cell, 24 hours a day, where the medical records show that he consistently urinated blood from an infection that was never treated, banged his head into the wall, paced naked for hours everyday and stood upright for so long that he developed ulcers on his feet.   Defendant FRANKOWITZ, MONICAL and several other Armor medical providers were all aware of this and did nothing until May 22, 2012, when Mr. Priester was found unresponsive on the floor of his isolation cell.

82.     On May 22, 2012, when Mr. Priester was transferred to the North Broward Medical Center (NBMC) he weighed 139 pounds, 101 pounds less than the day he was arrested.   Mr. Priester was diagnosed as being hypotensive with a blood pressure of 94/40, malnourished, dehydrated, septic, and suffering from bilateral pneumonia.   His treating physician stated his condition was extremely critical.

83.     Realizing that Priester was gravely ill and malnourished the medical staff at NBMC consulted a dietitian who prescribed a high-calorie diet.   By May 25, 2012, Priester, with

proper nutrition, gained 11 pounds and his weight rose to 151 pounds

84.     On May 29, 2012, Priester was discharged from NBMC back to the Broward County Jail with specific instructions to the jail regarding Priester's continuation of care for his diagnosed serious medical conditions.

85.     From May 29 to June 25, 2012, Priester was returned to solitary confinement and employees of ISRAEL and ARMOR, including Defendant FRANKOWITZ, failed to provide him with any of the medication ordered by the hospital and then they all stood by and watched as he slowly died.  According to Mr. Priester's jail medical records during this time he was observed being agitated, non-verbal, talking to himself, urinating and defecating everywhere except the toilet and being in obvious medical crisis.

86.     On July 10, 2012, Priester was found dead on the floor of his solitary confinement cell. **He weighed 120 pounds.**  In 155 days Priester's weight had dropped from 240 pounds to 120 pounds.

87.     The death of Raleigh Priester formed the basis of Case No. 14-61577-Civ-Bloom, a federal civil rights lawsuit filed in the Southern District of Florida which settled in the summer of 2015.

**Arthur Sacco:**

88.     Mr. Sacco was housed in the infirmary of the North Broward Bureau (NBB) like Mr. Obremski and was a patient of Defendant FRANKOWITZ and many of the same the same ARMOR employees who let Mr. Obremski die.

89.     On June 21, 2012 Mr. Sacco was brought to Memorial Regional Hospital as a Baker

Act because he was intoxicated and had voiced a desire to end his own life.  Sacco went through the withdrawal process without difficulty at the hospital.  Once the hospital determined he was stable he was released to the police due to their bringing him in. Sacco was transported directly to the Broward County Jail where he was booked in on June 25, 2012.

90.     On June 27, 2012 Defendant FRANKOWITZ met with Sacco, evaluated him and conducted a history and physical.  In his history and physical Defendant FRANKOWITZ recorded that Sacco was a 52-year-old white male with a mental health history including several past Baker Acts, a prior major spinal surgery and a gastric bypass surgery in 2008. Defendant FRANKOWITZ did not find any current physical ailments or current serious medical conditions during the examination on June 27, 2012.

91.     On June 29, 2012, Defendant FRANKOWITZ again evaluated Sacco and this time he recorded that Sacco was vomiting, suffering from severe back pain and that his blood pressure had increased.

92.     On July 4, 2012, at 7:15 A.M. ARMOR employee, Lashanta Rufus, LPN was contacted by a  BSO Deputy and was told that  Sacco was vomiting and had diarrhea.  The Deputy reported that Sacco was too weak to hold himself up.  ARMOR employee Rufus recorded that Sacco was dry heaving and had a constant flow of diarrhea.  A BSO Sergeant ordered Sacco moved to the infirmary.  Then, with the help of staff, Sacco was showered to remove the vomit and diarrhea and was put into a diaper.

93.     On July 4, 2012, at 3:10 P.M. ARMOR employee LPN Saint-Louis documented that while she was distributing medication, Sacco was unable to stand without help.  At this point, a BSO Deputy requested that ARMOR move Sacco to Unit 1F5, which is a medical placement for critically ill inmates, as soon as possible.

94.     On July 4, 2012, at 9:30 P.M. ARMOR employee LPN Warner recorded in Sacco's medical chart that he was unable to stand on his own.  Therefore, a mattress was placed on the floor, and because he was physically unable to change his diaper, his diaper was changed for him. At this point ARMOR medical personnel, including Defendant FRANKOWITZ, were aware that Sacco was critically ill and needed to be transported to the hospital. However, they failed to have him moved to a hospital or provide more intensive treatment within the jail.

95.     On July 5, 2012, at 1:00 PM, Sacco was again seen by Defendant FRANKOWITZ who recorded that the day before Sacco had been found by BSO Deputies in his cell covered in emesis (vomit) and diarrhea.  Defendant FRANKOWITZ documented that Sacco was very frail, his tongue was dry, and he had poor skin turgor (a sign of severe dehydration).  At this point Defendant, FRANKOWITZ knew that Sacco was critically ill and needed to be moved to an outside hospital for treatment.   However, Defendant FRANKOWITZ deliberately ignored the clear signs of a medical emergency and failed to move Sacco to a hospital for treatment.

96.     On July 5, 2012, at 1:45 P.M. Sacco was evaluated by ARMOR employee Sylvain LPN who found Sacco laying on a mat and only able to mumble a few words.  She recorded that Sacco, still in a diaper, was so weak that he was unable to hold a cup or water or food to his mouth without assistance.

97.     On July 5, 2012, at 4:30 P.M. Sacco was evaluated by ARMOR employee nurse Janis who found Sacco so severely ill that she was only able to arouse him with a deep sternum rub – (a deep sternum rub is what is used when an individual is unconscious and unable to be aroused by other methods).  Nurse Janis recorded that Sacco was dehydrated and his skin was dry and warm.  Defendant FRANKOWITZ was contacted and apprised of the situation.

At this point Sacco had been in a diaper and unable to stand on his own for over 30 hours and his condition was rapidly deteriorating.  However, Defendant FRANKOWITZ and the rest of ARMOR'S medical employees failed to transfer Sacco to the hospital.

98.     On July 6, 2012, at 1:30 A.M. ARMOR employee Defendant MONICAL recorded that Sacco was medically critical and in a state of shock.  She recorded in her notes that Sacco was unresponsive and only opened his eyes slightly when she moved him so that she could take his vital signs.  Defendant MONICAL was not able to take Sacco's temperature because Sacco was unable to close his mouth around the thermometer.  There was no medical justification for failing to transport Sacco to a hospital where he could be properly treated for his serious medical conditions yet she failed to do so.

99.     Through the early morning hours of July 6, 2012, Sacco was kept on IV fluids, and the amount was increased because he was not responding.  He was dying and needed hospitalization.

100.    On July 6, 2012, at 10:00 AM, Defendant FRANKOWITZ again saw Sacco. Defendant FRANKOWITZ recorded that Sacco could only be aroused with a sternum rub, that Sacco had been on an IV for 18 hours and was still medically critical.

101.    Six hours later, on July 6, 2012, at 4:00 PM Defendant FRANKOWITZ recorded in Sacco's medical chart that the lab results showed that Sacco was in shock and that a medical emergency existed.  The results as recorded by Defendant FRANKOWITZ showed that Sacco's blood urea nitrogen levels had increased from 13 mg/dL (normal) on June 26th to 108 mg/dL.  This increase indicated life-threatening dehydration or kidney failure.  Based on these findings Defendant FRANKOWITZ wrote in Sacco's medical chart that the labs confirmed that Sacco was severely dehydrated and his blood urea nitrogen was extremely high.  Defendant FRANKOWITZ put a star next to the words "severe dehydration" in his

24

handwritten notes.  Defendant FRANKOWITZ then wrote that Sacco was already on an IV underlining the words, "already on an IV," indicating that he realized that the IV was not stabilizing Sacco.  Defendant FRANKOWITZ also recorded that Sacco's white blood count (WBC) was 21,900 mm³.  A WBC of 11,000 mm³ or higher suggests an acute bacterial infection.  Sacco also had a fever of almost 101.  The blood urea nitrogen indicated a severe, life-threatening dehydration and the WBC and fever suggested that he had an infection.  His clinical deterioration together with the laboratory results indicated infection plus dehydration and constituted a medical emergency that required immediate hospitalization.  Still, Defendant FRANKOWITZ failed to have Sacco transported to the hospital.

102.    On July 6, 2012, at 6:30 PM ARMOR employee nurse Janis inserted a Foley catheter into Sacco's penis.  Sacco, according to Nurse Janis' notes, was not verbally responsive but moaned at times.

103.    Then on July 6, 2012, at 11:00 PM a BSO Deputy was conducting a head count of inmates when he noticed Sacco was unresponsive in his cell.  The Deputy contacted ARMOR employee Defendant MONICAL, who called ARMOR physician, Dr. Hoffman, who approved the transfer of Sacco to the hospital.  Defendant MONICAL called EMS about two hours after she was contacted by the concerned Deputy.  EMS arrived at 1:04 AM on July 7, 2012.

104.    Based on Sacco's hospital records when he arrived in the emergency room he was quickly diagnosed as being in septic shock.  A CT scan revealed a perforated bowel. As he was being prepped for surgery, he coded and was pronounced dead at 8:47 AM on July 7, 2012.

105.    Sacco's death was preventable.  He would not have died if ARMOR'S medical personnel, including Defendants FRANKOWITZ and MONICAL, and others had

transported Mr. Sacco to the hospital without the medically unjustified delay.

106.    After Sacco's death ARMOR completed a three-page "Mortality or Morbidity Review" that evaluated the care provided to Sacco by ARMOR and found that, Sacco was admitted to the infirmary on July 3, 2012, for vomiting, diarrhea, and severe dehydration. Sacco had an elevated WBC count and temperature of 100.8. ARMOR concluded that **"perhaps he [SACCO] could have been sent sooner to the hospital."**

107.    The medical care of Sacco and the "Mortality or Morbidity Review" was discussed at meeting held on July 19, 2012.  This meeting was attended by ARMOR'S medical director, regional vice president, director of nursing, health services administrator and five other high-ranking ARMOR employees.  Therefore, ARMOR and BSO were aware of the constitutional deficiencies in the care of Sacco and even with this knowledge failed to make any changes that would prevent this type of unnecessary death in the future.

108.    All claims involving the death of Mr. Sacco were settled with the representation of the undersigned before a suit was filed in.


**William Herring, Jr. – Case No: 16-cv-62950 (Southern Dist. of Florida)**

109.    The death of Mr. Herring forms the basis of a civil rights case in Southern District under case number 16-cv-62950 that was resolved in May of 2018.

110.    William Herring, Jr. was a severely mentally ill 22-year-old who was arrested in Port Saint Lucie, FL for violating his Broward County mental health probation.  He had left a treatment facility and was found sleeping on a bus bench.  He spent several days in the Saint Lucie County jail where he was Baker Acted because he was refusing to eat and was identified as being severely mentally ill.

111.    Mr. Herring arrived in the Broward County jail on October 26, 2012.  At intake ARMOR received the paperwork from Saint Lucie County showing that Mr. Herring had not eaten anything for several days.   Mr. Herring explained to the ARMOR medical providers that he fasting and would not eat, drink or take any medication because that is what God asked of him.  Mr. Herring also disclosed that he was bipolar, not taking his medication and that he had recently been hospitalized for mental health reasons.

112.    From October 26th to November 8, 2012, the ARMOR medical records show that Mr. Herring spent his days either rocking back and forth on his bunk naked or walking around his cell naked.  Mr. Herring consistently refused food and liquids explaining that he was not suicidal but that he was not eating or drinking for religious reasons.  Mr. Herring was seen many times by Defendants FRANKOWITZ, MONICAL and other ARMOR employees who all filed to treat Mr. Herrings serious medical needs caused by his fasting.

113.    On November 2, 2012, Broward Circuit Court Judge Singhal entered an order directing ARMOR and BSO to immediately have Mr. Herring seen by the psychiatric staff to determine the need for medication.  Judge Singhal wrote ASAP at the end of the order. This order was ignored by all the Defendants.

114.    Late on November 8, 2012, Mr. Herring collapsed in the jail and was transported by EMS to the emergency room at North Broward Medical Center (NBMC).  On intake at the hospital, Mr. Herring's blood was drawn, and he was found to be severely dehydrated.  The hospital started IV therapy to stabilize him.

115.    Mr. Herring remained in the hospital for six days while he was stabilized, his severe dehydration was treated with an IV, and his mental illness was treated with Haldol injections.

116.    On November 14, 2012, Mr. Herring was examined by Defendant FRANKOWITZ. Based on Defendant FRANKOWITZ'S own notes he was aware that: Mr. Herring is

currently not eating or drinking; that he was just released from the hospital after a six-day stay; that he was in the hospital because he had become critically dehydrated from not eating or drinking; that the discharge instructions were to have Mr. Herring moved to a psychiatric hospital and to continue him on his previously ordered Haldol.   However, Defendant FRANKOWITZ did nothing.   He allowed Mr. Herring to remain acutely psychotic, unmedicated and not taking in fluids knowing that not treating this serious medical condition would result in Mr. Herring's death.

117.   On November 15, 2012, Armor employee doctor Martin again examined Mr. Herring, he documented that he was lying on his bunk; he would not respond to his questions; he was still refusing his meals and was responding to internal stimuli – meaning that Mr. Herring was hallucinating.  Dr, Martin failed to transfer Mr. Herring to a facility that could care for him and instead allowed Mr. Herring to suffer and become more dehydrated.

118.   On November 16, 2012, at about five in the morning, doctor Martin again examined Mr. Herring and found him lying naked on the bunk and not responding to his questions. Again doctor Martin failed to act even knowing that in past 24 hours since he last saw him, Mr. Herring had not moved from his bunk and had not consumed any food or water.

119.   On November 16, 2012, Mr. Herring collapsed when he was being transported to court.  Mr. Herring was transported to Broward General Medical Center where he was found to be severely dehydrated and was exhibiting almost no brain activity.

120.   For the next five weeks, Mr. Herring's mother and father sat by the bedside of their 22-year-old son as he struggled for his life on a ventilator.

121.   After five weeks of sitting with their child day and night Mr. Herring's mother and father, based on the doctor's advice, decide to remove the life support and see if Mr. Herring could survive on his own.  Mr. Herring did not survive and on December 22, 2012, William

Herring, Jr. died.  His parents donated his organs.

122.    The Broward County Medical Examiner conducted an autopsy and concluded that Mr. Herring's death was caused by "complications of an electrolyte imbalance due to prolonged fasting and the contributing cause was mental illness".

123.    After Mr. Herring's death ARMOR and BSO conducted no investigation and therefore, ARMOR ratified the unconstitutional conduct of its employees and BSO ratified the unconstitutional conduct of ARMOR.

**Simon Valacheryil**

124.    On November 11, 2015, 66-year-old Simon Valacheryil was arrested and booked into the jail.

125.    He was housed in the mental health unit of the North Broward Bureau until January 3, 2015, when he was transferred to the infirmary and placed under the direct care of Defendant FRANKOWITZ.  At this point, Mr. Valacheryil was described as weak, frail and unable to get out of bed.  He was placed into an adult diaper.  Defendant FRANKOWITZ reviewed the results from Mr. Valacheryil's blood tests that all showed that he was critically dehydrated and suffering from an acute and severe infection.  Defendant FRANKOWITZ and all of ARMOR's other employees failed to have Mr. Valacheryil transferred to an outside hospital for care despite their knowledge that Mr. Valacheryil was in need of hospital-level care.

126.    From January 3rd to January 7, 2015 Mr. Valacheryil's health continued to deteriorate as shown by his physical state, increasingly critical lab results and the blood in his stool.  All indications were that he was dying, but again, Defendant FRANKOWITZ and ARMOR's other employees failed to have Mr. Valacheryil transferred to an outside hospital.

29

127.     Finally, in the early morning hours of January 7, 2015, Mr. Valacheryil was sent to the hospital.  However, at this point, because of Mr. Valacheryil's moribund state, there was nothing the hospital could do, and Mr. Valacheryil died at 5:52 AM on January 7, 2015.

128.     When the Emergency Room received Mr. Valacheryil, they diagnosed him with a gastrointestinal bleed, pancreatitis, renal insufficiency, and sepsis.  At autopsy, the Broward County Medical Examiner ruled that the cause of death was a gastrointestinal bleed and infectious pericarditis.

**Scott Burrell – Case No.: 17-cv-62007-Gayles (Southern Dist. of Florida)**

129.     On February 18, 2016, Mr. Burrell was book into the Broward Jail.  Within four days he was transferred to the NBB and came under the care of Defendants FRANKOWITZ, MONICAL and MCDONALD.

130.     On March 30, 2016, at 11:30 a.m., Armor employee J. Jones examined Mr. Burrell. J. Jones documented that Mr. Burrell was complaining of severe abdominal pain and had critical vital signs consisting of a weak pulse and a blood oxygen saturation that had decreased to 88%.  J. Jones also recorded that Mr. Burrell was incontinent of urine, his jail uniform was soaked with urine, he was disheveled, dirty and his gait was so unsteady that he was placed into a wheelchair to be moved to the infirmary.  At this point, J. Jones was aware that Mr. Burrell was medically critical and needed emergency treatment at an outside hospital.  However, J. Jones failed to have Mr. Burrell transferred to an outside hospital for care and treatment.

131.     At 12:20 p.m. on March 30, 2016, Armor employee Mizrahy evaluated Mr. Burrell. Defendant MIZRAHY recorded in his medical chart that Mr. Burrell was brought to her as an emergency patient.  Mr. Burrell reported to her that he had drunk a lot of water, urinated

in his bed eight times and was experiencing abdominal pain.  Mizrahy recorded that Mr. Burrell was wheelchair bound, disheveled, odiferous, unsteady, short of breath, wearing a blood and urine stained uniform, with a rapid heart rate and an elevated temperature. Mizrahy knew that Mr. Burrell was critically ill and in need of a higher level of evaluation and care than the jail could provide.  However, she failed to have Mr. Burrell sent to an outside hospital for care or make any arrangements to diagnose the cause of Mr. Burrell's critical vital signs and acute abdomen.

132.     Defendant FRANKOWITZ, also evaluated Mr. Burrell on March 30, 2016 at 12:30 p.m. He found Mr. Burrell confined to a wheelchair in the same condition noted in the above paragraph.  Mr. Burrell told Defendant FRANKOWITZ that he was working for the C.I.A. and that he was very anxious.  FRANKOWITZ was aware of the documented prior critical vital signs, abdominal pain, and elevated temperature.  Defendant FRANKOWITZ knew that this was a medical emergency and that Mr. Burrell could not be properly diagnosed or treated in the jail and was in need of emergency medical care.  However, he failed to order any diagnostic procedures or have Mr. Burrell transferred to an outside hospital for diagnosis, care, and/or treatment.

133.     Three hours later on March 30, 2016, Patricia Rell, an ARMOR employee and ARMOR employee J. Jones were called to Mr. Burrell's cell by a BSO deputy.  They found Mr. Burrell covered with fresh feces, urine, and vomit and curled in a fetal position.  Per the medical records Mr. Burrell's blood pressure had fallen to a critically low level, and his pulse was extremely rapid.  Mr. Burrell stated that his abdomen was painful and that he wanted to go to the fourth floor of the jail because his wife was there and was waiting for him.  J Jones, Patricia Rell and a BSO deputy placed Mr. Burrell into his wheelchair and bathed him where they found feces caked up his back and a rash in his groin area.  Per their reports, Mr. Burrell

was wincing with pain when the washcloth touched his abdomen. These ARMOR employees knew that this was a medical emergency and that without diagnosis and treatment in an outside hospital Mr. Burrell would die. Despite their knowledge that the jail infirmary couldn't provide the level of care he needed, the these providers merely relocated Mr. Burrell the infirmary.

134.    On March 31, 2016 at 1:10 a.m. Defendant MONICAL, an ARMOR nurse, evaluated Mr. Burrell in the infirmary.  Defendant MONICAL documented that Mr. Burrell was confused, disoriented and his vital signs were still critical.  He still had an altered mental state, and he thought it was 3 p.m., and he wanted to call his wife to come and get him. Defendant MONICAL, knowing that Mr. Burrell was medically critical and in need of emergency medical intervention failed to do anything.  She did not contact a doctor, she did not examine his abdomen, and she did not have him moved to the hospital where he could have received the treatment and care that he required.  Her only plan was to continue to monitor Mr. Burrell.

135.    At noon on March 31, 2016, Defendant FRANKOWITZ, evaluated Mr. Burrell after he reviewed the laboratory results from Mr. Burrell's blood draw that was done the day before.  Defendant FRANKOWITZ realized that the results were critically abnormal and showed that Mr. Burrell had a severe infection and dehydration.  The lab results provided FRANKOWITZ objective evidence that Mr. Burrell was medically critical and would die without real medical intervention which could not be provided in the jail.  Mr. Burrell's White Blood Count (WBC) was 16,800 indicating that his body was fighting an infection (normal WBC range is 3,600-11,000).   Thirty percent of this elevated WBC was composed of Band Neutrophils.  The normal range for these Band Neutrophils is 3% to 5% of the total WBC.  An increase in Band Neutrophils typically means that the bone marrow has been

signaled to release more WBCs.  Most often this is due to an infection in the body.  At this point, Defendant FRANKOWITZ had in addition to the lab results, the evidence from his evaluations of Mr. Burrell and all the documentation in the chart which confirmed that Mr. Burrell was dying and in need of hospitalization.   FRANKOWITZ chose to neglect Mr. Burrell and leave him without any treatment.  He did not examine his abdomen, did not order emergency radiologic examinations or have Mr. transferred to an outside hospital for care and/or treatment.

136.   On April 1, 2016, at 12:40 a.m., Defendant MCDONALD, an ARMOR employee recorded in Mr. Burrell's medical chart that Mr. Burrell was disoriented and wanted to see his wife who he thought that she was downstairs.  Defendant MCDONALD examined Mr. Burrell's abdomen and found it to be tender, distended and with hypoactive sounds (all textbook symptoms of an emergency abdominal infection).   Defendant MCDONALD documented that she found green vomit at Mr. Burrell's bedside and that he physically exhibited signs of severe dehydration.   However, Defendant MCDONALD, like her colleagues failed to treat or diagnose Mr. Burrell's serious medical condition or have him transferred to an outside hospital when she knew that it was medically necessary.

137.   At 10:45 a.m. on April 1, 2016, Mr. Burrell was found unresponsive in his cell and was transported to North Broward Medical Center.  Mr. Burrell arrived at the emergency room at 11:43 a.m. and was pronounced dead at 11:59 a.m.

138.   An autopsy was conducted and the medical examiner concluded that Mr. Burrell died from "peritonitis secondary to bowel perforation".

139.   Mr. Burrell died a slow, painful and preventable death from a common and treatable medical condition.

140.   Based on ARMORS review of Mr. Burrell's death Defendant FRANKOWITZ was

fired.  ARMOR's policymakers concluded that Defendant FRANKOWITZ failed to send Mr. Burrell to an outside hospital for care and treatment in a medically appropriate manner. (Ex. 1 at pg. 4)

**April Farrah**

141.    On May 14, 2016, April Farrah was arrested for possessing an open container of beer.

142.    At 6 p.m. on May 14, 2016, ARMOR employees identified that Ms. Farrah was seriously ill and they placed her in the infirmary of NBB where she was under the care of Defendants FRANKOWITZ, MCDONALD, MONICAL and MILLS.

143.    Ms. Farrah's health continued to deteriorate until May 18, 2016, at 6:03 a.m., when jail records show that Ms. Farrah had a catastrophic gastrointestinal bleed.  According to the BSO records, she defecated blood all over her cell in such a substantial quantity that BSO employees contacted a Hazmat team to enter the jail and clean the cell.  Defendant MILLS observed and documented the medical emergency and did nothing.  Ms. Farrah was not transferred to an outside hospital for diagnosis or treatment and was instead placed into a clean isolation cell.

144.    For the next day and night, Ms. Farrah was kept in the isolation cell in the infirmary and was in contact with several ARMOR employees who all ignored her serious medical condition and allowed her to deteriorate until she collapsed and EMS was called on May 19, 2016.

145.    Ms. Farrah died at the hospital on May 19, 2016, and the Broward County Medical Examiner concluded that she died of a "gastrointestinal hemorrhage".

146.    After the death of Ms. Farrah Defendant ARMOR conducted an investigation and concluded that Mr. Burrell, Mr. Obremski, and Ms. Farrah all should have been sent to the hospital and not kept in the infirmary.  Defendant FRANKOWITZ was fired after this investigation, but ARMOR or BSO did not take any other remedial action to reduce the chances that this type of death would not occur again.  (Ex. 1 at page 4).

## The Consent Decree

147.    Broward Sheriff's Office and the Plaintiffs in the Carruthers class action entered into the Stipulation for Entry of Consent Decree on July 27, 1994 (the "Consent Decree"), which was then ratified and confirmed by Judge Hoeveler on January 31, 1995. On June 7, 1995, Judge Hoeveler issued an amended Order incorporating the settlement agreement of the parties.  (Case 76-cv-06086-DMM).

148.    The Consent Decree acknowledged that conditions of confinement had been determined to be unconstitutional and provided that all Broward County correctional facilities would be operated and maintained, at a minimum, by applying the most stringent provisions of applicable Federal and Florida law and the standards set forth in Chapter 33-8 of the Florida Administrative Code, the American Correctional Association Standards for Adult Local Detention Facilities, and the National Commission on Correctional Healthcare Standards of medical, dental and mental health services.  Consent Decree at pg. 2, ¶ 4; pg. 4, at ¶ 10.

149.    The consent decree is still in force and applies to all DEFENDANTS who are named in this lawsuit, the above-listed failures have never been corrected although the DEFENDANTS have been aware of the problems for over a decade.

150.    The DEFENDANTS had/have a duty to ensure that reasonable measures were taken

to provide for the safety of inmates at the Broward County Jail facility.

151.    The above acts and omissions of the DEFENDANTS constitutes a course of conduct and failure to act amounting to deliberate indifference to the rights, health, safety, and welfare of Mr. Obremski and those similarly situated, resulting in the deprivation of his/their constitutional rights.

152.    Federal and state law, as well as accepted corrections and medical practices at the time of the incident, provided "fair warning" to DEFENDANTS that their conduct was improper, incompetent, illegal and in violation of Mr. Obremski's constitutional rights.

153.    The acts and omissions of the DEFENDANTS, as set forth above, violated established and well settled Federal constitutional rights of Mr. Obremski, i.e., due process of law under the Fourteenth Amendment to the United States Constitution.

154.    As a direct and proximate result of the acts and omissions of the DEFENDANTS as set forth above, Mr. Obremski suffered the following injuries and damages:

      a.   Violation of his constitutional rights under the Fourteenth Amendment to the United States Constitution;

      b.   Loss of his life.

### COUNT  1:  42  U.S.C.  §1983  CLAIM AGAINST DEFENDANT ARMOR CORRECTIONAL HEALTH SERVICES, INC

155.    The Plaintiff realleges paragraphs 1-4, 6, 7, 10-154.

156.    Since 2004 ARMOR has collected about $325,000,000 of taxpayer money from Defendant ISRAEL and the people of Broward County to provide comprehensive healthcare (including constitutionally required healthcare) to all inmates in the Broward County Jail system which is operated and supervised by ISRAEL.

36

157.   During this period ARMOR was aware through its own record keeping that its employees had been deliberately indifferent to the serious medical conditions of hundreds of inmates and continue to be deliberately indifferent to the serious medical conditions of inmates.  This deliberate indifference caused the deaths of the inmates listed above and exposed hundreds of other inmates to unnecessary pain and suffering since 2004.

158.   ARMOR, with knowledge of these prior horrible and preventable deaths and many other poor health outcomes caused by their employees' deliberate indifference to the serious medical need of inmates, failed to remedy the longstanding custom of medical and mental health neglect, diliberate indifference and the failure to send critically ill individuals to outside hospitals without any medically unjustified delay and therefore made it foreseeable and inevitable that others, such as Mr. Obremski, would be harmed and die.

159.   Defendant ARMOR had a duty to train, supervise, control or otherwise ensure that the doctors and nurses under its control, including, but not limited to, the named DEFENDANTS in this case, did not violate the constitutional rights of persons such as Mr. Obremski.

160.   At all times material hereto, Defendant ARMOR was responsible for adopting and implementing the rules and regulations regarding hiring, screening, training, supervising, retaining, controlling, disciplining and assigning their medical employees to their duties.

161.   ARMOR failed to comply with these obligations, as its employees, including the named DEFENDANTS in this case and others, breached their duties by failing to, assess, monitor, medicate, hydrate, diagnosis, treat Mr. Obremski and have him transferred to an outside hospital without any medically unjustified delay.

162.   Defendant ARMOR failed to properly train, retain and supervise its medical

37

employees in the screening, assessment, treatment, care, and monitoring and supervision of inmates. ARMOR's employees demonstrated deliberate indifference to the health and well-being of inmates such as M r . O b r e m s k i , by failing to conduct appropriate health screening, assessments, treatment, care, monitoring, medication, supervision, and transfer to local hospitals without any medically unjustified delay. Said failures resulted in Mr. Obremski suffering and death.

163. Defendant ARMOR, through its employees, has exhibited its deliberate indifference to unconstitutional medical care that has resulted in the horrible and preventable deaths of the individuals listed in the complaint as well as others. ARMOR has maintained a system of review of the treatment of inmates which has failed to identify the improper treatment by the medical employees. ARMOR's system of review has also failed to subject those who are deliberately indifferent or negligent to appropriate discipline, supervision, dismissal and/or retraining, to the extent that it has become the de facto policy and custom of ARMOR to tolerate the improper medical treatment of detainees within the Broward County Jail System.

164. Defendant ARMOR, a for-profit company, has intentionally engaged in a practice of not sending inmates to outside medical providers for treatment even when it is medically necessary because the cost doing so decreases ARMOR's profits. Mr. Obremski required hospital level healthcare for medical needs, and because he did not get it, he suffered and died.

165. Defendant ARMOR has acted with deliberate indifference to the needs of the inmates in Broward by failing to implement any policy or custom that would address the needs of ill

38

inmates and those inmates who are in need of outside hospitalization.

166.    Defendant ARMOR, with the authority of State law, acted in reckless disregard of both constitutional prohibitions and guarantees under color of state law, thereby misusing the power it possessed.

167.    Mr. Obremski has been a victim of the above-mentioned illegal treatment of detainees and said illegal treatment was the direct result of the previously described acts, omissions, policies or customs of ARMOR.

168.    The deliberate indifference of ARMOR violated the constitutional rights of Mr. Obremski for which 42 U.S.C. § 1983 provides a remedy.

169.    Mr. Obremski suffered a horrible, painful and preventable death as a result of ARMOR'S actions.

        **WHEREFORE**, PLAINTIFFS demand compensatory and punitive damages against Defendant ARMOR CORRECTIONAL HEALTH SERVICES, INC., attorney fees, costs, and trial by jury for all issues so triable by right.

### COUNT 2:  42 U.S.C. § 1983 CLAIM AGAINST DEFENDANT ISRAEL

170.    The Plaintiffs reallege paragraphs 1-4, 6, 7, 10-154.

171.    Defendant ISRAEL, as the Chief Correctional Officer, appointed by the Broward County Board of County Commissioners, had a duty to train, supervise, control and otherwise ensure that Defendant ARMOR and ARMOR'S employees, including, but not limited to the ARMOR employees named in this complaint did not violate the constitutional rights of persons such as Mr. Obremski.  Said Defendant abdicated his policymaking and

oversight responsibilities, thereby allowing and making foreseeable the incident involving Mr. Obremski to occur.

172.     Defendant ISRAEL, knew or should have known: (1) of ARMOR'S medical staff's failure to properly assess and treat inmate's serious medical needs and failure to have inmates transferred to outside hospitals when it is medically necessary; (2) of preventable poor health outcomes of inmates and deaths that resulted from improper treatment and neglect; (3) that investigations into incidents of inmate neglect and poor medical outcomes including death were incompetent and failed to address the misconduct of the ARMOR employees and/or corrections officers; (4) that ARMOR has failed to correct the problems identified in the consent decree or that ARMOR identifed in their mortality review; (5) that ARMOR has a custom or policy of not sending ill inmates to a facility that can provide them with the level of healthcare that they require; (6) that ARMOR's employees have a custom of acting with deliberate indifference to the serious medical needs of inmates which results in deaths and preventable poor health outcomes; (8) that the named Defendants were incompetent, dangerous and required additional supervision and/or should be terminated; (9) that by 2016 ARMOR had developed a long history of providing unconstitutional and negligent healthcare across the country and that they required robust supervision in Broward County and/or should not have their contract renewed every year by Defendant ISRAEL.  Defendant ISRAEL was deliberately indifferent to the unreasonable risk he was exposing Broward County inmates to when he failed to remedy any of the above problems with the foreseeable result being the creation of circumstances that resulted in the neglect and death of Mr. Obremski.

173.     Defendant ISRAEL, because he renewed the contract with ARMOR in 2017 and

again in 2018 and has not terminated the contract with ARMOR has exhibited his continued deliberate indifference to the unconstitutional and negligent medical care provided by ARMOR.

174.    At all times material hereto, Defendant ISRAEL was responsible for adopting and implementing rules and regulations regarding assessment, medical treatment, housing, and monitoring of detainees.

175.    Said Defendant was deliberately indifferent to his duties in that he either expressly or impliedly acknowledged and assented to the failure to train, supervise, control or otherwise screen employees and contractors of  BSO including Defendants ARMOR and the ARMOR's employees named in this complaint and other ARMOR employees for, lack of training and/or skill or other characteristics making said medical providers and employees unfit to perform their duties at the Broward County Jail facilities.

176.    Defendant ISRAEL was aware of the problems and conditions existing  in the Broward County Jail System, such as the horrible and preventable deaths listed in this complaint and other  deaths and injuries that resulted from poor monitoring, improper medical classification, improper medical screening, improper medical assessment, unacceptable medical care of inmates, including failing to send critically ill inmates to outside hospitals without any medically unjustified delay.

177.    Defendant ISRAEL was deliberately indifferent to the safety of the inmates by failing to remedy these problems, even though he had notice of them.

178.    Defendant ISRAEL'S deliberate indifference to these problems caused a substantial risk of harm to the Mr. Obremski and other inmates housed in Broward County Jail facilities.

179.    The Defendant ISRAEL has maintained a system of review of the treatment and care

41

of detainees, which has failed to identify and/or correct the improper treatment and neglect by his officers and/or ARMOR and ARMOR'S employees who fail to properly classify, monitor, treat, assess, medicate, protect, and house detainees.  This review system fails to provide appropriate discipline, supervision, dismissal and/or retraining, to the extent that it has become a de facto policy and custom of Defendant ISRAEL to tolerate the improper treatment and neglect of ill detainees such as Mr. Obremski.

180.    The foregoing acts, omissions, policies or customs of Defendant ISRAEL caused deputies and/or corrections officers and/or agents and/or employees and ARMOR and ARMOR's employees to believe there exists no meaningful duty to properly classify, monitor, treat, assess, medicate, protect, house or send detainees to an outside hospital for care, with the foreseeable result being that deputies and/or corrections officers and/or agents and/or employees and ARMOR and ARMOR's employees ignored the needs of ill detainees and endanger the safety and lives of inmates such as Mr. Obremski.

181.    The deliberate indifference of ISRAEL violated the constitutional rights of Mr. Obremski for which 42 U.S.C. §1983 provides a remedy.

182.    The above acts and omissions of ISRAEL constitute a course of conduct and failure to act amounting to deliberate indifference to the rights, health, safety, and welfare of Mr. Obremski and those similarly situated, resulting in the deprivation of the Mr. Obremski's constitutional rights.

183.    Mr. Obremski has been a victim of the above-mentioned illegal treatment of detainees and said illegal treatment was the direct result of the previously described acts, omissions, policies or customs of Defendant ISRAEL.

184.    As a direct and proximate cause of the acts described above, Mr. Obremski died a preventable and horrible death.

**WHEREFORE**, PLAINTIFFS demand compensatory damages against Defendant ISRAEL, attorney fees, costs, and trial by jury for all issues so triable by right.

## COUNT 3: 42 U.S.C. §1983 CLAIM AGAINST DEFENDANT FRANKOWITZ

185.    The Plaintiffs reallege paragraphs 1-4, 6, 7, 10, 11, 14, 26-154.

186.    At all times material hereto Defendant FRANKOWITZ, was employed by ARMOR as a doctor and was Mr. Obremski's primary doctor, and as such, he was responsible for the healthcare provided to Mr. Obremski. This medical care included the monitoring, diagnosis and treatment of Mr. Obremskit's serious medical needs including transferring Mr. Obremski to a hospital when it became apparent that he was in urgent need of hospitalization.

187.    Defendant FRANKOWITZ was acting under color of state law as an employee of Defendant ARMOR when he subjected Mr. Obremski to the deprivation of rights and privileges secured to him under the Fourteenth Amendment to the United States Constitution.

188.    The slow and preventable death of Mr. Obremski was a reasonably foreseeable consequence of this Defendant's deliberate indifference to his obligation to provide appropriate medical care and to transfer Mr. Obremski to the hospital without any medically unjustified delay.

189.    Based on ARMOR'S records and reports regarding the deaths of the inmates listed in this complaint and others, Defendant FRANKOWITZ was on notice that prior inmates under his and ARMOR's care had died as a result of his deliberate indifference to their serious medical needs and not transferring them to outside hospitals without any unjustified

delay.

190.    FRANKOWITZ failed to assess, medicate, treat, monitor, and have Mr. Obremski

sent to a hospital for care, despite his notice and knowledge of Mr. Obremski's serious

medical conditions and need of hospitalization.

191.    The deliberate indifference of FRANKOWITZ violated the constitutional rights

of Mr. Obremski for which 42 U.S.C. §1983 provides a remedy.

192.    As a direct and proximate result of the violation of Mr. Obremski's constitutional

rights by Defendant FRANKOWITZ, Mr. Obremski suffered a horrible and preventable

death.

    **WHEREFORE**, PLAINTIFFS demand compensatory and punitive damages against

Defendant FRANKOWITZ, attorney fees, costs, and trial by jury for all issues so triable by

right.


### COUNT 4: 42 U.S.C. §1983 CLAIM AGAINST DEFENDANT MONICAL

193.    The Plaintiffs reallege paragraphs 1-4, 6, 7, 10, 11, 15, 26-153.

194.    At all times material hereto Defendant MONICAL, was employed by ARMOR as a

nurse and she was responsible for the healthcare provided to Mr. Obremski. This medical

care included the monitoring, diagnosis and treatment of Mr. Obremski's serious medical

needs including transferring Mr. Obremski to a hospital when it became apparent that he was

in urgent need of hospitalization.

195.    Defendant MONICAL was acting under color of state law as an employee of

Defendant ARMOR when he subjected Mr. Obremski to the deprivation of rights and

44

privileges secured to him under the Fourteenth Amendment to the United States Constitution.

196.    The slow and preventable death of Mr. Obremski was a reasonably foreseeable consequence of this Defendant's deliberate indifference to his obligation to provide appropriate medical care and to transfer Mr. Obremski to the hospital without any medically unjustified delay.

197.    Based on ARMOR'S records and reports regarding the deaths of the inmates listed in this complaint and others, Defendant MONICAL was on notice that prior inmates under her and ARMOR's care had died as a result of his deliberate indifference to their serious medical needs and not transferring them to outside hospitals without any unjustified delay.

198.    MONICAL failed to assess, medicate, treat, monitor, and have Mr. Obremski sent to a hospital for care, despite her notice and knowledge of Mr. Obremski's serious medical conditions and need of hospitalization.

199.    The deliberate indifference of MONICAL violated the constitutional rights of Mr. Obremski for which 42 U.S.C. §1983 provides a remedy.

200.    As a direct and proximate result of the violation of Mr. Obremski's constitutional rights by Defendant MONICAL, Mr. Obremski suffered a horrible and preventable death.

**WHEREFORE**, PLAINTIFFS demand compensatory and punitive damages against Defendant MONICAL, attorney fees, costs, and trial by jury for all issues so triable by right.

## **COUNT 5: 42 U.S.C. §1983 CLAIM AGAINST DEFENDANT MCDONALD**

201.    The Plaintiffs reallege paragraphs 1-4, 6, 7, 10, 11, 16, 26-153.

202.    At all times material hereto Defendant MCDONALD, was employed by ARMOR as

a nurse, and as such, she was responsible for the healthcare provided to Mr. Obremski. This medical care included the monitoring, diagnosis and treatment of Mr. Obremski's serious medical needs including transferring Mr. Obremski to a hospital when it became apparent that he was in urgent need of hospitalization.

203.    Defendant MCDONALD was acting under color of state law as an employee of Defendant ARMOR when she subjected Mr. Obremski to the deprivation of rights and privileges secured to him under the Fourteenth Amendment to the United States Constitution.

204.    The slow and preventable death of Mr. Obremski was a reasonably foreseeable consequence of this Defendant's deliberate indifference to his obligation to provide appropriate medical care and to transfer Mr. Obremski to the hospital without any medically unjustified delay.

205.    Based on ARMOR'S records and reports regarding the deaths of the inmates listed in this complaint and others, Defendant MCDONALD was on notice that prior inmates under her and ARMOR's care had died as a result of deliberate indifference to their serious medical needs and not transferring them to outside hospitals without any unjustified delay.

206.    MCDONALD failed to assess, medicate, treat, monitor, and have Mr. Obremski sent to a hospital for care, despite his notice and knowledge of Mr. Obremski's serious medical conditions and need of hospitalization.

207.    The deliberate indifference of MCDONALD violated the constitutional rights of Mr. Obremski for which 42 U.S.C. §1983 provides a remedy.

208.    As a direct and proximate result of the violation of Mr. Obremski's constitutional rights by Defendant MCDONALD, Mr. Obremski suffered a horrible and preventable death.

**WHEREFORE**, PLAINTIFFS demand compensatory and punitive damages against Defendant MCDONALD, attorney fees, costs, and trial by jury for all issues so triable by right.

## COUNT 6: 42 U.S.C. §1983 CLAIM AGAINST DEFENDANT PARKE

209.    The Plaintiffs reallege paragraphs 1-4, 6, 7, 10, 11, 17, 26-153.

210.    At all times material hereto Defendant PARKE, was employed by ARMOR as a nurse, and as such, she was responsible for the healthcare provided to Mr. Obremski. This medical care included the monitoring, diagnosis and treatment of Mr. Obremski's serious medical needs including transferring Mr. Obremski to a hospital when it became apparent that he was in urgent need of hospitalization.

211.    Defendant PARKE was acting under color of state law as an employee of Defendant ARMOR when she subjected Mr. Obremski to the deprivation of rights and privileges secured to him under the Fourteenth Amendment to the United States Constitution.

212.    The slow and preventable death of Mr. Obremski was a reasonably foreseeable consequence of this Defendant's deliberate indifference to his obligation to provide appropriate medical care and to transfer Mr. Obremski to the hospital without any medically unjustified delay.

213.    Based on ARMOR'S records and reports regarding the deaths of the inmates listed in this complaint and others, Defendant PARKE was on notice that prior inmates under her and ARMOR's care had died as a result of deliberate indifference to their serious medical needs and not transferring them to outside hospitals without any unjustified delay.

214.    PARKE failed to assess, medicate, treat, monitor, and have Mr. Obremski sent to a

hospital for care, despite his notice and knowledge of Mr. Obremski's serious medical conditions and need of hospitalization.

215.    The deliberate indifference of PARKE violated the constitutional rights of Mr. Obremski for which 42 U.S.C. §1983 provides a remedy.

216.    As a direct and proximate result of the violation of Mr. Obremski's constitutional rights by Defendant PARKE, Mr. Obremski suffered a horrible and preventable death.

**WHEREFORE**, PLAINTIFFS demand compensatory and punitive damages against Defendant PARKE, attorney fees, costs, and trial by jury for all issues so triable by right.


## COUNT 7: 42 U.S.C. §1983 CLAIM AGAINST DEFENDANT SPENCE

217.    The Plaintiffs reallege paragraphs 1-4, 7, 10, 11, 18, 26-153.

218.    At all times material hereto Defendant SPENCE, was employed by ARMOR as a nurse, and as such, she was responsible for the healthcare provided to Mr. Obremski. This medical care included the monitoring, diagnosis and treatment of Mr. Obremski's serious medical needs including transferring Mr. Obremski to a hospital when it became apparent that he was in urgent need of hospitalization.

219.    Defendant SPENCE was acting under color of state law as an employee of Defendant ARMOR when she subjected Mr. Obremski to the deprivation of rights and privileges secured to him under the Fourteenth Amendment to the United States Constitution.

220.    The slow and preventable death of Mr. Obremski was a reasonably foreseeable consequence of this Defendant's deliberate indifference to his obligation to provide appropriate medical care and to transfer Mr. Obremski to the hospital without any medically

48

unjustified delay.

221.    Based on ARMOR'S records and reports regarding the deaths of the inmates listed in this complaint and others, Defendant SPENCE was on notice that prior inmates under her and ARMOR's care had died as a result of deliberate indifference to their serious medical needs and not transferring them to outside hospitals without any unjustified delay.

222.    SPENCE failed to assess, medicate, treat, monitor, and have Mr. Obremski sent to a hospital for care, despite his notice and knowledge of Mr. Obremski's serious medical conditions and need of hospitalization.

223.    The deliberate indifference of SPENCE violated the constitutional rights of Mr. Obremski for which 42 U.S.C. §1983 provides a remedy.

224.    As a direct and proximate result of the violation of Mr. Obremski's constitutional rights by Defendant SPENCE, Mr. Obremski suffered a horrible and preventable death.

    **WHEREFORE**, PLAINTIFFS demand compensatory and punitive damages against Defendant SPENCE, attorney fees, costs, and trial by jury for all issues so triable by right.


## COUNT 8: 42 U.S.C. §1983 CLAIM AGAINST DEFENDANT MOWATT

225.    The Plaintiffs reallege paragraphs 1-4, 7, 10, 11, 19, 26-153.

226.    At all times material hereto Defendant MOWATT, was employed by ARMOR as a nurse, and as such, she was responsible for the healthcare provided to Mr. Obremski. This medical care included the monitoring, diagnosis and treatment of Mr. Obremski's serious medical needs including transferring Mr. Obremski to a hospital when it became apparent that he was in urgent need of hospitalization.

227.    Defendant MOWATT was acting under color of state law as an employee of Defendant ARMOR when she subjected Mr. Obremski to the deprivation of rights and privileges secured to him under the Fourteenth Amendment to the United States Constitution.

228.    The slow and preventable death of Mr. Obremski was a reasonably foreseeable consequence of this Defendant's deliberate indifference to his obligation to provide appropriate medical care and to transfer Mr. Obremski to the hospital without any medically unjustified delay.

229.    Based on ARMOR'S records and reports regarding the deaths of the inmates listed in this complaint and others, Defendant MOWATT was on notice that prior inmates under her and ARMOR's care had died as a result of deliberate indifference to their serious medical needs and not transferring them to outside hospitals without any unjustified delay.

230.    MOWATT failed to assess, medicate, treat, monitor, and have Mr. Obremski sent to a hospital for care, despite his notice and knowledge of Mr. Obremski's serious medical conditions and need of hospitalization.

231.    The deliberate indifference of MOWATT violated the constitutional rights of Mr. Obremski for which 42 U.S.C. §1983 provides a remedy.

232.    As a direct and proximate result of the violation of Mr. Obremski's constitutional rights by Defendant MOWATT, Mr. Obremski suffered a horrible and preventable death.

**WHEREFORE**, PLAINTIFFS demand compensatory and punitive damages against Defendant MOWATT, attorney fees, costs, and trial by jury for all issues so triable by right.


**COUNT 9: 42 U.S.C. §1983 CLAIM AGAINST DEFENDANT MILLS**

233.   The Plaintiffs reallege paragraphs 1-4, 7, 10, 11, 20, 26-153.

234.   At all times material hereto Defendant MILLS, was employed by ARMOR as a nurse, and as such, she was responsible for the healthcare provided to Mr. Obremski. This medical care included the monitoring, diagnosis and treatment of Mr. Obremski's serious medical needs including transferring Mr. Obremski to a hospital when it became apparent that he was in urgent need of hospitalization.

235.   Defendant MILLS was acting under color of state law as an employee of Defendant ARMOR when she subjected Mr. Obremski to the deprivation of rights and privileges secured to him under the Fourteenth Amendment to the United States Constitution.

236.   The slow and preventable death of Mr. Obremski was a reasonably foreseeable consequence of this Defendant's deliberate indifference to his obligation to provide appropriate medical care and to transfer Mr. Obremski to the hospital without any medically unjustified delay.

237.   Based on ARMOR'S records and reports regarding the deaths of the inmates listed in this complaint and others, Defendant MILLS was on notice that prior inmates under her and ARMOR's care had died as a result of deliberate indifference to their serious medical needs and not transferring them to outside hospitals without any unjustified delay.

238.   MILLS failed to assess, medicate, treat, monitor, and have Mr. Obremski sent to a hospital for care, despite his notice and knowledge of Mr. Obremski's serious medical conditions and need of hospitalization.

239.   The deliberate indifference of MILLS violated the constitutional rights of Mr. Obremski for which 42 U.S.C. §1983 provides a remedy.

240.    As a direct and proximate result of the violation of Mr. Obremski's constitutional rights by Defendant MILLS, Mr. Obremski suffered a horrible and preventable death.

**WHEREFORE**, PLAINTIFFS demand compensatory and punitive damages against Defendant MILLS, attorney fees, costs, and trial by jury for all issues so triable by right.

### COUNT 10: 42 U.S.C. §1983 CLAIM AGAINST DEFENDANT KERR

241.    The Plaintiffs reallege paragraphs 1-4, 7, 10, 11, 21, 26-154.

242.    At all times material hereto Defendant KERR, was employed by ARMOR as a nurse, and as such, she was responsible for the healthcare provided to Mr. Obremski. This medical care included the monitoring, diagnosis and treatment of Mr. Obremski's serious medical needs including transferring Mr. Obremski to a hospital when it became apparent that he was in urgent need of hospitalization.

243.    Defendant KERR was acting under color of state law as an employee of Defendant ARMOR when she subjected Mr. Obremski to the deprivation of rights and privileges secured to him under the Fourteenth Amendment to the United States Constitution.

244.    The slow and preventable death of Mr. Obremski was a reasonably foreseeable consequence of this Defendant's deliberate indifference to his obligation to provide appropriate medical care and to transfer Mr. Obremski to the hospital without any medically unjustified delay.

245.    Based on ARMOR'S records and reports regarding the deaths of the inmates listed in this complaint and others, Defendant KERR was on notice that prior inmates under her and ARMOR's care had died as a result of deliberate indifference to their serious medical

needs and not transferring them to outside hospitals without any unjustified delay.

246.     KERR failed to assess, medicate, treat, monitor, and have Mr. Obremski sent to a hospital for care, despite his notice and knowledge of Mr. Obremski's serious medical conditions and need of hospitalization.

247.     The deliberate indifference of KERR violated the constitutional rights of Mr. Obremski for which 42 U.S.C. §1983 provides a remedy.

248.     As a direct and proximate result of the violation of Mr. Obremski's constitutional rights by Defendant KERR, Mr. Obremski suffered a horrible and preventable death.

        **WHEREFORE**, PLAINTIFFS demand compensatory and punitive damages against Defendant KERR, attorney fees, costs, and trial by jury for all issues so triable by right.


**COUNT 11: 42 U.S.C. §1983 CLAIM AGAINST DEFENDANT DORCELY**

249.     The Plaintiffs reallege paragraphs 1-4, 7, 10, 11, 21, 26-153.

250.     At all times material hereto Defendant DORCELY, was employed by ARMOR as a nurse, and as such, she was responsible for the healthcare provided to Mr. Obremski. This medical care included the monitoring, diagnosis and treatment of Mr. Obremski's serious medical needs including transferring Mr. Obremski to a hospital when it became apparent that he was in urgent need of hospitalization.

251.     Defendant DORCELY was acting under color of state law as an employee of Defendant ARMOR when she subjected Mr. Obremski to the deprivation of rights and privileges secured to him under the Fourteenth Amendment to the United States Constitution.

252.     The slow and preventable death of Mr. Obremski was a reasonably foreseeable

consequence of this Defendant's deliberate indifference to his obligation to provide appropriate medical care and to transfer Mr. Obremski to the hospital without any medically unjustified delay.

253.    Based on ARMOR'S records and reports regarding the deaths of the inmates listed in this complaint and others, Defendant DORCELY was on notice that prior inmates under her and ARMOR's care had died as a result of deliberate indifference to their serious medical needs and not transferring them to outside hospitals without any unjustified delay.

254.    DORCELY failed to assess, medicate, treat, monitor, and have Mr. Obremski sent to a hospital for care, despite his notice and knowledge of Mr. Obremski's serious medical conditions and need of hospitalization.

255.    The deliberate indifference of DORCELY violated the constitutional rights of Mr. Obremski for which 42 U.S.C. §1983 provides a remedy.

256.    As a direct and proximate result of the violation of Mr. Obremski's constitutional rights by Defendant DORCELY, Mr. Obremski suffered a horrible and preventable death.

**WHEREFORE**, PLAINTIFFS demand compensatory and punitive damages against Defendant DORCELY, attorney fees, costs, and trial by jury for all issues so triable by right.


## COUNT 12: 42 U.S.C. §1983 CLAIM AGAINST DEFENDANT BURGESS

257.    The Plaintiffs reallege paragraphs 1-4, 7, 10, 11, 16, 26-153.

258.    At all times material hereto Defendant BURGESS, was employed by ARMOR as a doctor, and as such, she was responsible for the healthcare provided to Mr. Obremski. This medical care included the monitoring, diagnosis and treatment of Mr. Obremski's serious

medical needs including transferring Mr. Obremski to a hospital when it became apparent that he was in urgent need of hospitalization.

259.    Defendant BURGESS was acting under color of state law as an employee of Defendant ARMOR when she subjected Mr. Obremski to the deprivation of rights and privileges secured to him under the Fourteenth Amendment to the United States Constitution.

260.    The slow and preventable death of Mr. Obremski was a reasonably foreseeable consequence of this Defendant's deliberate indifference to his obligation to provide appropriate medical care and to transfer Mr. Obremski to the hospital without any medically unjustified delay.

261.    Based on ARMOR'S records and reports regarding the deaths of the inmates listed in this complaint and others, Defendant BURGESS was on notice that prior inmates under her and ARMOR's care had died as a result of deliberate indifference to their serious medical needs and not transferring them to outside hospitals without any unjustified delay.

262.    BURGESS failed to assess, medicate, treat, monitor, and have Mr. Obremski sent to a hospital for care, despite his notice and knowledge of Mr. Obremski's serious medical conditions and need of hospitalization.

263.    The deliberate indifference of BURGESS violated the constitutional rights of Mr. Obremski for which 42 U.S.C. §1983 provides a remedy.

264.    As a direct and proximate result of the violation of Mr. Obremski's constitutional rights by Defendant BURGESS, Mr. Obremski suffered a horrible and preventable death.

**WHEREFORE**, PLAINTIFFS demand compensatory and punitive damages against Defendant BURGESS, attorney fees, costs, and trial by jury for all issues so triable by right.

**FLORIDA STATE LAW CLAIMS AGAINST DEFENDANTS
BSO, ARMOR, FRANKOWITZ,  R.N. JERI MONICAL, R.N. CYNTHIA
MCDONALD, LPN MARVA PARKE, R.N. TRACY SPENCE, R.N. KUMAR
MOWATT, R.N. KATHLEEN MILLS, R.N. ASTOR KERR, R.N. MAUREEN
DORCELY AND DOCTOR JERRY BURGESS**

265.     This is an action for damages in excess of $15,000.00, arising in Broward County,

Florida.

266.     The Plaintiffs reallege paragraphs 8 and 9.

267.     The Plaintiff resides in Broward County, Florida and has complied with all state law

notice requirements per § 768 of the Florida Statutes.

268.     On or about March 22, 2016, to April 5, 2016, SCOTT ISRAEL was the Sheriff of

Broward County.  Said Defendant is responsible, as Sheriff, for the conduct of ARMOR

and its employees as he has retained ARMOR to provide medical care for all inmates in

the Broward County Jail.  ISRAEL is also responsible, as Sheriff, for the conduct of all

deputies and corrections officers in his employ and ensuring that his deputies, corrections

officers, employees, servants, and agents obey the laws of the State of Florida and the

United States.  Said Defendant is being sued in his official capacity.

269.     On or about March 22, 2016 to April 5, 2016 ARMOR, was a Florida corporation

doing business as a provider of healthcare within the Broward County jail system in

Broward County, Florida.

270.     Defendants, FRANKOWITZ, MONICAL, MCDONALD, PARKE, SPENCE,

MOWATT, MILLS, KERR, DORCELY and BURGESS all currently reside in Broward

County.

271.   At all material times, Defendants FRANKOWITZ, MONICAL, MCDONALD, PARKE, SPENCE, MOWATT, MILLS, KERR, DORCELY and BURGESS were agents or employees who were acting within the course and scope of his employment with ARMOR.

272.   Plaintiffs have complied with the requirements of § 766.106(2), Fla. Stat., by mailing a notice of intent to initiate litigation for medical negligence to defendants FRANKOWITZ, MONICAL, MCDONALD, PARKE, SPENCE, MOWATT, MILLS, KERR, DORCELY and BURGESS by certified mail, return receipt requested.

273.   Plaintiff's attorney certifies pursuant to § 766.104, Fla. Stat., that he made a reasonable investigation as permitted by the circumstances to determine that there are grounds for a good-faith belief that there was negligence in the care and treatment of Mr. Obremski that caused his death.

274.   Plaintiff's attorney certifies that a reasonable investigation gave rise to a good-faith belief that grounds exist for an action against each named defendant.

275.   It has been determined by plaintiff's expert, that the medical care provided by Defendants FRANKOWITZ, MONICAL, MCDONALD, PARKE, SPENCE, MOWATT, MILLS, KERR, DORCELY and BURGESS represent a breach of the prevailing professional standard of care, any or all of which were departures from the accepted standard of care and treatment rendered by physicians, nurses or LPNs of ordinary skill and learning in Broward, Florida, and similar medical communities.

276.   As a direct and proximate result of the negligent care provided by FRANKOWITZ, MONICAL, MCDONALD, PARKE, SPENCE, MOWATT, MILLS, KERR, DORCELY and BURGESS Mr. Obremski died a horrible and preventable death from medical negligence.

## COUNT 13:  MEDICAL NEGLIGENCE CLAIM AGAINST DEFENDANT FRANKOWITZ

277.    Plaintiff incorporates by reference paragraphs 5, 8-11, 14, 26-153, 265-276 of this

Complaint as if specifically set forth herein and further states as follows:

278.    Defendant FRANKOWITZ owed a reasonable duty of care to Mr. Obremski while

he was his patient from March 23, 2016 to April 4, 2016, and all other times while under

his care.

279.    Defendant FRANKOWITZ negligently breached his duty owed to Mr. Obremski in

that said defendant did or failed to do one or more of the following acts:

   i.    Failed to properly treat Mr. Obremski's withdrawal.

  ii.    Failed to refer Mr. Obremski to an appropriate facility for treatment of his
         withdrawal.

 iii.    Failed to perform an adequate history and physical examination.

  iv.    Failed to recognize the seriousness of Mr. Obremski's medical condition.

   v.    Failed to refer Mr. Obremski to an appropriate healthcare facility for
         treatment of his obvious infection.

  vi.    Failed to correctly interpret Mr. Obremski's laboratory studies.

 vii.    Failed to recognize the critical nature of Mr. Obremski's vital signs and
         laboratory values.

viii.    Failed to properly diagnosis Mr. Obremski's medical condition.

  ix.    Failed to order imaging studies.

   x.    Failed to consult an infectious disease doctor or any properly trained and
         competent doctor.

    xi.  Ordered a non-steroidal anti-inflammatory for Mr. Obremski that caused the gastrointestinal bleeding.

    xii.  Failed to properly diagnose Mr. Obremski's serious medical condition;

    xiii.  Failed to properly treat or diagnose Mr. Obremski's infection;

    xiv.  Failed to have Mr. Obremski transferred to an outside hospital in a timely manner;

    xv.  Failed to properly monitor Mr. Obremski's condition.

280.    As a direct and proximate result of the negligence of FRANKOWITZ Mr. Obremski suffered a slow, painful and preventable death.

281.    Defendant FRANKOWITZ's acts and omissions as outlined above were (1) of a gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects; (2) of such entire want of care that they raise the presumption of conscious indifference; (3) show a wantonness or recklessness or a grossly careless disregard for Mr. Obremski's safety and welfare; or (4) were done with reckless indifference to the rights of Mr. Obremski and are equivalent to an intentional violation of those rights. Therefore, Plaintiff is making a claim for punitive damages against Defendant FRANKOWITZ.

    **WHEREFORE**, PLAINTIFFS demand judgment against FRANKOWITZ, for compensatory and punitive damages or damages under 46.021 exclusive of costs and interest together with costs and prejudgment interest for that portion of the compensatory damages which have been previously liquidated, and any other relief to which PLAINTIFFS may be entitled and PLAINTIFFS demand a trial by jury of all issues so triable.

## COUNT 14:   VICARIOUS LIABILITY CLAIM AGAINST ARMOR

282.    Plaintiffs incorporate by reference paragraphs 1-3, 5, 8-11, 13-23, 26-153, 265-276, and 278-280 of this complaint as if specifically set forth herein and further states as follows:

283.    At all times material to this Complaint Defendants by FRANKOWITZ, MONICAL, MCDONALD, PARKE, SPENCE, MOWATT, MILLS, KERR, DORCELY and BURGESS were all acting within the course and scope of their employment as employees of Defendant ARMOR.  Defendant ARMOR was responsible for providing healthcare within the Broward County jail system.  The acts of negligence occurred within the Broward County jail and those acts caused Mr. Obremski's death.

284.    Defendants by FRANKOWITZ, MONICAL, MCDONALD, PARKE, SPENCE, MOWATT, MILLS, KERR, DORCELY and BURGESS owed a reasonable duty of care to Mr. Obremski as he was their patient in March and April of 2016.

285.    At all times material to this Complaint FRANKOWITZ was an employee of Armor Correctional Health Services, Inc., a Florida Corporation when he negligently breached the duty of care he owed to Mr. Obremski in that he did or failed to do one or more of the following acts as outlined in paragraph 279 of this complaint.

286.    At all times material to this Complaint MONICAL, was an employee of Defendant ARMOR when she negligently breached the duty of care she owed to Mr. Obremski as outlined in paragraphs 30 and 54 of this compliant.

287.    At all times material to this Complaint MCDONALD was an employee of Defendant ARMOR when she negligently breached the duty of care she owed to Mr. Obremski outlined in paragraphs 32, 36, 43, 51 and 56 of this complaint.

288.   At all times material to this Complaint PARKE was an employee of Defendant ARMOR when she negligently breached the duty of care she owed to Mr. Obremski in that she did or failed to do one or more of the following acts as outlined in paragraphs 53 and 55 of this complaint.

289.   At all times material to this Complaint SPENCE was an employee of Defendant ARMOR when she negligently breached the duty of care she owed to Mr. Obremski in that she did or failed to do one or more of the following acts as outlined in paragraph 52 of this complaint.

290.   At all times material to this Complaint MOWATT was an employee of Defendant ARMOR when he negligently breached the duty of care he owed to Mr. Obremski in that he did or failed to do one or more of the following acts outlined in paragraphs 42, 44, 45, 58, 59 and 60 of this complaint.

291.   At all times material to this Complaint MILLS, was an employee of Defendant ARMOR when she negligently breached the duty of care she owed to Mr. Obremski in that she did or failed to do one or more of the following acts as outlined in paragraphs 39.

292.   At all times material to this Complaint KERR was an employee of Defendant ARMOR when she negligently breached the duty of care she owed to Mr. Obremski in that she did or failed to do one or more of the following acts as outlined in paragraphs 35, 38, 40, 47, and 50.

293.   At all times material to this Complaint DORCELY was an employee of Defendant ARMOR when she negligently breached the duty of care she owed to Mr. Obremski in

that she did or failed to do one or more of the following acts as outlined in paragraph 37.

294.    At all times material to this Complaint BURGESS was an employee of Defendant

ARMOR when he negligently breached the duty of care he owed to Mr. Obremski in that

he did or failed to do one or more of the following acts as outlined in paragraphs 57, 59,

and 60.

295.    As a direct and proximate result of the negligence of Defendants FRANKOWITZ,

MONICAL, MCDONALD, PARKE, SPENCE, MOWATT, MILLS, KERR,

DORCELY and BURGESS and other ARMOR employees Mr. Obremski died a slow,

horrible and preventable death.

296.    Defendant, ARMOR is a Florida Corporation and was the employer of all the above

listed individuals when they committed the tortious acts that either individually or in

conjunction with one another either jointly or severally caused or contributed to Mr.

Obremski's death.  All of the above listed individuals were acting within the course and

scope of their employment with ARMOR and therefore ARMOR is vicariously liable for

their negligence and Mr. Obremski's resulting death.

**WHEREFORE**, Plaintiffs demands judgment against defendant, ARMOR, for

compensatory and punitive damages jointly and severally with all other Defendants exclusive

of costs or damages under 46.021 and interest together with costs and prejudgment interest

for that portion of the compensatory damages which have been previously liquidated, and

any other relief to which Plaintiffs may be entitled and Plaintiffs demands a trial by jury of

all issues so triable.

## COUNT 15:  VICARIOUS CLAIM AGAINST BSO BASED ON THE NON-DELEGABLE DUTY TO PROVIDE HEALTHCARE

297.    Plaintiff incorporates by reference paragraphs 1-3, 5, 8-23, 26-153, 265-276, 278-280, of this Complaint as if specifically set forth herein and further states as follows:

298.    ISRAEL as the Sheriff of Broward County owes a non-delegable duty to provide healthcare to inmates in the Broward County jail system.

299.    ISRAEL has contracted with Defendant ARMOR to carry out this non-delegable duty.

300.    As outlined in paragraphs 26-153, 279-281 and 283 to 295 above ARMOR's employees' breached the duty to provide non-negligent medical care to Mr. Obremski when they were carrying out BSO's non-delegable duty to provide healthcare; this negligence caused his death.

301.    BSO is vicariously liable for the damages caused by ARMOR and ARMOR's employees and Mr. Obremski's death.

**WHEREFORE**, Plaintiffs demands judgment against BSO for compensatory damages or damages under 46.021 jointly and severally with all other defendants exclusive of costs and interest together with costs and prejudgment interest for that portion of the compensatory damages which have been previously liquidated, and any other relief to which Plaintiffs may be entitled and Plaintiffs demand a trial by jury of all issues so triable.

## COUNT 16:  VICARIOUS CLAIM AGAINST BSO BASED ON THE AGENCY RELATIONSHIP BETWEEN ARMOR AND BSO

302.    BSO entered into a contract with ARMOR whereby ARMOR agreed to provide healthcare within the Broward County Jail for BSO.  Plaintiff also incorporates by reference paragraphs 1-3, 5, 8-23, 26-153, 265-276 of this Complaint.

63

303.    As outlined in paragraphs 26-153, 279-281 and 283 to 295 herein ARMOR's employees breached the duty to provide non-negligent medical care to Mr. Obremski when they were carrying out their contractual duties.

304.    This failure to provide the appropriate level of medical care occurred within the course and scope of said employees employment and these acts of negligence caused Mr. Obremski's death.

WHEREFORE, Plaintiffs demand judgment against BSO for compensatory damages jointly and severally with all other defendants exclusive of costs and interest together with costs or damages under 46.021 and prejudgment interest for that portion of the compensatory damages which have been previously liquidated, and any other relief to which Plaintiffs may be entitled and Plaintiffs demand a trial by jury of all issues so triable.

## COUNT 17:  MEDICAL NEGLIGENCE CLAIM AGAINST DEFENDANT MONICAL

305.    Plaintiff incorporates by reference paragraphs 5, 8-11, 15, 26-154, 265-276, 286, 295, 296 of this Complaint as if specifically set forth herein and further states as follows:

306.    Defendant MONICAL owed a reasonable duty of care to Mr. Obremski while he was her patient from March 23, 2016 to April 5, 2016, and all other times while under her care.

307.    Defendant MONICAL negligently breached her duty owed to Mr. Obremski in that said defendant did or failed to do one or more of the following acts:

      i.   Failed to properly treat Mr. Obremski's withdrawal.

      ii.  Failed to refer Mr. Obremski to an appropriate facility for treatment of his withdrawal.

iii.  Failed to recognize the seriousness of Mr. Obremski's medical condition.

iv.  Failed to refer Mr. Obremski to an appropriate healthcare facility for treatment of his obvious infection.

v.  Failed to alert any medical provider about Mr. Obremski's deteriorating condition.

vi.  Failed to recognize the critical nature of Mr. Obremski's vital signs and physical appearance.

vii.  Failed to properly treat or identify Mr. Obremski's infection and deteriorating medical condition;

viii.  Failed to have Mr. Obremski transferred to an outside hospital in a timely manner;

ix.  Failed to properly monitor Mr. Obremski's condition.

308.  As a direct and proximate result of the negligence of MONICAL Mr. Obremski suffered a slow, painful and preventable death.

309.  Defendant MONICALS's acts and omissions were (1) of gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects; (2) of such entire want of care that would raise the presumption of conscious indifference; (3) show a wantonness or recklessness or a grossly careless disregard for Mr. Obremski's safety and welfare; or (4) were done with reckless indifference to the rights of Mr. Obremski that it is equivalent to an intentional violation of those rights. Therefore, Plaintiff is making a claim for punitive damages against Defendant MONICAL.

**WHEREFORE**, PLAINTIFFS demand judgment against MONICAL, for

compensatory and punitive damages exclusive of costs and interest together with costs and prejudgment interest for that portion of the compensatory damages which have been previously liquidated, or damages under 46.021 and any other relief to which PLAINTIFFS may be entitled and PLAINTIFFS demand a trial by jury of all issues so triable.

## COUNT 18:  MEDICAL NEGLIGENCE CLAIM AGAINST DEFENDANT MCDONALD

310.  Plaintiff incorporates by reference paragraphs 5, 8-11, 16, 26-154, 265-276, 287, 295, 296 of this Complaint as if specifically set forth herein and further states as follows:

311.  Defendant MCDONALD owed a reasonable duty of care to Mr. Obremski while he was her patient from March 23, 2016 to April 5, 2016, and all other times while under her care.

312.  Defendant MCDONALD negligently breached his duty owed to Mr. OBREMSKI in that said defendant did or failed to do one or more of the following acts:

      i.  Failed to properly treat Mr. Obremski's withdrawal.

      ii.  Failed to refer Mr. Obremski to an appropriate facility for treatment of his withdrawal.

      iii.  Failed to recognize the seriousness of Mr. Obremski's medical condition.

      iv.  Failed to refer Mr. Obremski to an appropriate healthcare facility for treatment of his obvious infection.

      v.  Failed to alert any medical provider about Mr. Obremski's deteriorating condition.

      vi.  Failed to recognize the critical nature of Mr. Obremski's vital signs

and physical appearance.

    vii.   Failed to properly treat or identify Mr. Obremski's infection and deteriorating medical condition;

   viii.   Failed to have Mr. Obremski transferred to an outside hospital in a timely manner;

    ix.   Failed to properly monitor Mr. Obremski's condition.

313.    As a direct and proximate result of the negligence of MCDONALD, Mr. Obremski suffered a slow, painful and totally preventable death.

314.    Defendant MCDONALD'S acts and omissions as outlined above were (1) of gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects; (2) of such entire want of care that would raise the presumption of conscious indifference; (3) show a wantonness or recklessness or a grossly careless disregard for the public's safety and welfare; or (4) done with reckless indifference to the rights of Mr. Obremski that is equivalent to an intentional violation of those rights. Therefore, Plaintiff is making a claim for punitive damages against Defendant MCDONALD.

    **WHEREFORE**, PLAINTIFF demands judgment against MCDONALD, for compensatory and punitive damages together with costs and prejudgment interest for that portion of the compensatory damages which have been previously liquidated, or damages under 46.021 and any other relief to which PLAINTIFFS may be entitled and PLAINTIFFS demand a trial by jury of all issues so triable.

**<u>COUNT 19:  MEDICAL NEGLIGENCE CLAIM AGAINST DEFENDANT PARKE</u>**

315.    Plaintiff incorporates by reference paragraphs 5, 8-11, 17, 26-154, 265-276, 288, 295,

296 of this Complaint as if specifically set forth herein and further states as follows:

316.  Defendant PARKE owed a reasonable duty of care to Mr. Obremski while he was her patient from March 23, 2016 to April 5, 2016, and all other times while under her care.

317.  Defendant PARKE negligently breached his duty owed to Mr. OBREMSKI in that said defendant did or failed to do one or more of the following acts:

> i.  Failed to properly treat Mr. Obremski's withdrawal.
>
> ii.  Failed to refer Mr. Obremski to an appropriate facility for treatment of his withdrawal.
>
> iii.  Failed to recognize the seriousness of Mr. Obremski's medical condition.
>
> iv.  Failed to refer Mr. Obremski to an appropriate healthcare facility for treatment of his obvious infection.
>
> v.  Failed to alert any medical provider about Mr. Obremski's deteriorating condition.
>
> vi.  Failed to recognize the critical nature of Mr. Obremski's vital signs and physical appearance.
>
> vii.  Failed to properly treat or identify Mr. Obremski's infection and deteriorating medical condition;
>
> viii.  Failed to have Mr. Obremski transferred to an outside hospital in a timely manner;
>
> ix.  Failed to properly monitor Mr. Obremski.

318.  As a direct and proximate result of the negligence of PARKE, Mr. Obremski suffered a slow, painful and totally preventable death.

319.   Defendant PARKE'S acts and omissions as outlined above were (1) of gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects; (2) of such entire want of care that would raise the presumption of conscious indifference; (3) show a wantonness or recklessness or a grossly careless disregard for the public's safety and welfare; or (4) done with reckless indifference to the rights of Mr. Obremski that is equivalent to an intentional violation of those rights. Therefore, Plaintiff is making a claim for punitive damages against Defendant PARKE.

WHEREFORE, PLAINTIFF demands judgment against PARKE, for compensatory and punitive damages together with costs and prejudgment interest for that portion of the compensatory damages which have been previously liquidated, or damages under 46.021 and any other relief to which PLAINTIFFS may be entitled and PLAINTIFFS demand a trial by jury of all issues so triable.

## COUNT 20:  MEDICAL NEGLIGENCE CLAIM AGAINST DEFENDANT SPENCE

320.   Plaintiff incorporates by reference paragraphs 5, 8-11, 18, 26-154, 265-276, 289, 295, 296 of this Complaint as if specifically set forth herein and further states as follows:

321.   Defendant SPENCE owed a reasonable duty of care to Mr. Obremski while he was her patient from March 23, 2016 to April 5, 2016, and all other times while under her care.

322.   Defendant SPENCE negligently breached his duty owed to Mr. OBREMSKI in that said defendant did or failed to do one or more of the following acts:

    i.   Failed to properly treat Mr. Obremski's withdrawal.

    ii.   Failed to refer Mr. Obremski to an appropriate facility for treatment

of his withdrawal.

    iii.  Failed to recognize the seriousness of Mr. Obremski's medical condition.

    iv.  Failed to refer Mr. Obremski to an appropriate healthcare facility for treatment of his obvious infection.

    v.  Failed to alert any medical provider about Mr. Obremski's deteriorating condition.

    vi.  Failed to recognize the critical nature of Mr. Obremski's vital signs and physical appearance.

    vii.  Failed to properly treat or identify Mr. Obremski's infection and deteriorating medical condition;

    viii.  Failed to have Mr. Obremski transferred to an outside hospital in a timely manner;

    ix.  Failed to properly monitor Mr. Obremski.

323.   As a direct and proximate result of the negligence of SPENCE, Mr. Obremski suffered a slow, painful and totally preventable death.

324.   Defendant SPENCE'S acts and omissions as outlined above were (1) of gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects; (2) of such entire want of care that would raise the presumption of conscious indifference; (3) show a wantonness or recklessness or a grossly careless disregard for the public's safety and welfare; or (4) done with reckless indifference to the rights of Mr. Obremski that is equivalent to an intentional violation of those rights. Therefore, Plaintiff is making a claim for punitive damages against Defendant SPENCE.

**WHEREFORE**, PLAINTIFF demands judgment against SPENCE, for compensatory and punitive damages together with costs and prejudgment interest for that portion of the compensatory damages which have been previously liquidated, or damages under 46.021 and any other relief to which PLAINTIFFS may be entitled and PLAINTIFFS demand a trial by jury of all issues so triable.

## COUNT 21:  MEDICAL NEGLIGENCE CLAIM AGAINST

## DEFENDANT MOWATT

325.    Plaintiff incorporates by reference paragraphs 5, 8-11, 19, 26-154, 265-276, 290, 295, 296 of this Complaint as if specifically set forth herein and further states as follows:

326.    Defendant MOWATT owed a reasonable duty of care to Mr. Obremski while he was her patient from March 23, 2016 to April 5, 2016, and all other times while under her care.

327.    Defendant MOWATT negligently breached his duty owed to Mr. OBREMSKI in that said defendant did or failed to do one or more of the following acts:

    i.   Failed to properly treat Mr. Obremski's withdrawal.

    ii.   Failed to refer Mr. Obremski to an appropriate facility for treatment of his withdrawal.

    iii.   Failed to recognize the seriousness of Mr. Obremski's medical condition.

    iv.   Failed to refer Mr. Obremski to an appropriate healthcare facility for treatment of his obvious infection.

    v.   Failed to alert any medical provider about Mr. Obremski's deteriorating condition.

vi.   Failed to recognize the critical nature of Mr. Obremski's vital signs and physical appearance.

vii.   Failed to properly treat or identify Mr. Obremski's infection and deteriorating medical condition;

viii.   Failed to have Mr. Obremski transferred to an outside hospital in a timely manner;

ix.   Failed to properly monitor Mr. Obremski.

328.   As a direct and proximate result of the negligence of MOWATT, Mr. Obremski suffered a slow, painful and totally preventable death.

329.   Defendant MOWATT'S acts and omissions as outlined above were (1) of gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects; (2) of such entire want of care that would raise the presumption of conscious indifference; (3) show a wantonness or recklessness or a grossly careless disregard for the public's safety and welfare; or (4) done with reckless indifference to the rights of Mr. Obremski that is equivalent to an intentional violation of those rights. Therefore, Plaintiff is making a claim for punitive damages against Defendant MOWATT.

**WHEREFORE**, PLAINTIFF demands judgment against MOWATT, for compensatory and punitive damages together with costs and prejudgment interest for that portion of the compensatory damages which have been previously liquidated, or damages under 46.021 and any other relief to which PLAINTIFFS may be entitled and PLAINTIFFS demand a trial by jury of all issues so triable.

**COUNT 22:  MEDICAL NEGLIGENCE CLAIM AGAINST DEFENDANT MILLS**

330. Plaintiff incorporates by reference paragraphs 5, 8-11, 20, 26-154, 265-276, 291, 295, 296 of this Complaint as if specifically set forth herein and further states as follows:

331. Defendant MILLS owed a reasonable duty of care to Mr. Obremski while he was her patient from March 23, 2016 to April 5, 2016, and all other times while under her care.

332. Defendant MILLS negligently breached his duty owed to Mr. OBREMSKI in that said defendant did or failed to do one or more of the following acts:

    i. Failed to properly treat Mr. Obremski's withdrawal.

    ii. Failed to refer Mr. Obremski to an appropriate facility for treatment of his withdrawal.

    iii. Failed to recognize the seriousness of Mr. Obremski's medical condition.

    iv. Failed to refer Mr. Obremski to an appropriate healthcare facility for treatment of his obvious infection.

    v. Failed to alert any medical provider about Mr. Obremski's deteriorating condition.

    vi. Failed to recognize the critical nature of Mr. Obremski's vital signs and physical appearance.

    vii. Failed to properly treat or identify Mr. Obremski's infection and deteriorating medical condition;

    viii. Failed to have Mr. Obremski transferred to an outside hospital in a timely manner;

    ix. Failed to properly monitor Mr. Obremski.

333. As a direct and proximate result of the negligence of MILLS, Mr. Obremski suffered a slow, painful and totally preventable death.

334.   Defendant MILLS' acts and omissions as outlined above were (1) of gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects; (2) of such entire want of care that would raise the presumption of conscious indifference; (3) show a wantonness or recklessness or a grossly careless disregard for the public's safety and welfare; or (4) done with reckless indifference to the rights of Mr. Obremski that is equivalent to an intentional violation of those rights. Therefore, Plaintiff is making a claim for punitive damages against Defendant MILLS.

**WHEREFORE**, PLAINTIFF demands judgment against MILLS, for compensatory and punitive damages together with costs and prejudgment interest for that portion of the compensatory damages which have been previously liquidated, or damages under 46.021 and any other relief to which PLAINTIFFS may be entitled and PLAINTIFFS demand a trial by jury of all issues so triable.

## COUNT 23:  MEDICAL NEGLIGENCE CLAIM AGAINST DEFENDANT KERR

335.   Plaintiff incorporates by reference paragraphs 5, 8-11, 21, 26-154, 265-276, 292, 295, 296 of this Complaint as if specifically set forth herein and further states as follows:

336.   Defendant KERR owed a reasonable duty of care to Mr. Obremski while he was her patient from March 23, 2016 to April 5, 2016, and all other times while under her care.

337.   Defendant KERR negligently breached his duty owed to Mr. OBREMSKI in that said defendant did or failed to do one or more of the following acts:

      i.   Failed to properly treat Mr. Obremski's withdrawal.

     ii.   Failed to refer Mr. Obremski to an appropriate facility for treatment of his withdrawal.

    iii.  Failed to recognize the seriousness of Mr. Obremski's medical condition.

    iv.  Failed to refer Mr. Obremski to an appropriate healthcare facility for treatment of his obvious infection.

    v.  Failed to alert any medical provider about Mr. Obremski's deteriorating condition.

    vi.  Failed to recognize the critical nature of Mr. Obremski's vital signs and physical appearance.

    vii.  Failed to properly treat or identify Mr. Obremski's infection and deteriorating medical condition;

    viii.  Failed to have Mr. Obremski transferred to an outside hospital in a timely manner;

    ix.  Failed to properly monitor Mr. Obremski.

338.    As a direct and proximate result of the negligence of KERR, Mr. Obremski suffered a slow, painful and totally preventable death.

339.    Defendant KERR'S acts and omissions as outlined above were (1) of gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects; (2) of such entire want of care that would raise the presumption of conscious indifference; (3) show a wantonness or recklessness or a grossly careless disregard for the public's safety and welfare; or (4) done with reckless indifference to the rights of Mr. Obremski that is equivalent to an intentional violation of those rights. Therefore, Plaintiff is making a claim for punitive damages against Defendant KERR.

    **WHEREFORE**, PLAINTIFF demands judgment against KERR, for compensatory

and punitive damages together with costs and prejudgment interest for that portion of the compensatory damages which have been previously liquidated, or damages under 46.021 and any other relief to which PLAINTIFFS may be entitled and PLAINTIFFS demand a trial by jury of all issues so triable.

### COUNT 24:  MEDICAL NEGLIGENCE CLAIM AGAINST DEFENDANT DORCELY

340.     Plaintiff incorporates by reference paragraphs 5, 8-11, 22, 26-154, 265-276, 293, 295, 296 of this Complaint as if specifically set forth herein and further states as follows:

341.   Defendant DORCELY owed a reasonable duty of care to Mr. Obremski while he was her patient from March 23, 2016 to April 5, 2016, and all other times while under her care.

342.   Defendant DORCELY negligently breached his duty owed to Mr. OBREMSKI in that said defendant did or failed to do one or more of the following acts:

    i.   Failed to properly treat Mr. Obremski's withdrawal.

    ii.   Failed to refer Mr. Obremski to an appropriate facility for treatment of his withdrawal.

    iii.   Failed to recognize the seriousness of Mr. Obremski's medical condition.

    iv.   Failed to refer Mr. Obremski to an appropriate healthcare facility for treatment of his obvious infection.

    v.   Failed to alert any medical provider about Mr. Obremski's deteriorating condition.

    vi.   Failed to recognize the critical nature of Mr. Obremski's vital signs

and physical appearance.

    vii.  Failed to properly treat or identify Mr. Obremski's infection and deteriorating medical condition;

    viii.  Failed to have Mr. Obremski transferred to an outside hospital in a timely manner;

    ix.  Failed to properly monitor Mr. Obremski.

343.   As a direct and proximate result of the negligence of DORCELY, Mr. Obremski suffered a slow, painful and totally preventable death.

344.   Defendant DORCELY'S acts and omissions as outlined above were (1) of gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects; (2) of such entire want of care that would raise the presumption of conscious indifference; (3) show a wantonness or recklessness or a grossly careless disregard for the public's safety and welfare; or (4) done with reckless indifference to the rights of Mr. Obremski that is equivalent to an intentional violation of those rights. Therefore, Plaintiff is making a claim for punitive damages against Defendant DORCELY.

    **WHEREFORE**, PLAINTIFF demands judgment against DORCELY, for compensatory and punitive damages together with costs and prejudgment interest for that portion of the compensatory damages which have been previously liquidated, or damages under 46.021 and any other relief to which PLAINTIFFS may be entitled and PLAINTIFFS demand a trial by jury of all issues so triable.

### COUNT 25:  MEDICAL NEGLIGENCE CLAIM AGAINST DEFENDANT BURGESS

345.   Plaintiff incorporates by reference paragraphs 5, 8-11, 23, 26-154, 265-276, 294-296 of this Complaint as if specifically set forth herein and further states as follows:

346.   Defendant BURGESS owed a reasonable duty of care to Mr. Obremski while he was his patient from March 23, 2016 to April 5, 2016, and all other times while under his care.

347.   Defendant BURGESS negligently breached his duty owed to Mr. OBREMSKI in that said defendant did or failed to do one or more of the following acts:

   i.   Failed to properly treat Mr. Obremski's withdrawal.

   ii.   Failed to refer Mr. Obremski to an appropriate facility for treatment of his withdrawal.

   iii.   Failed to perform an adequate history and physical examination.

   iv.   Failed to recognize the seriousness of Mr. Obremski's medical condition.

   v.   Failed to refer Mr. Obremski to an appropriate healthcare facility for treatment of his obvious infection.

   vi.   Failed to correctly interpret Mr. Obremski's laboratory studies.

   vii.   Failed to recognize the critical nature of Mr. Obremski's vital signs and laboratory values.

   viii.   Failed to properly diagnosis Mr. Obremski's medical condition.

   ix.   Failed to order imaging studies.

   x.   Failed to consult an infectious disease doctor or any properly trained and competent doctor.

   xi.   Ordered a non-steroidal anti-inflammatory for Mr. Obremski that caused the gastrointestinal bleeding.

      xii.   Failed to properly diagnose Mr. Obremski's serious medical condition;

     xiii.   Failed to properly treat or diagnose Mr. Obremski's infection;

     xiv.   Failed to have Mr. Obremski transferred to an outside hospital in a timely manner;

     xv.   Failed to properly monitor Mr. Obremski's condition.

348.   As a direct and proximate result of the negligence of BURGESS, Mr. Obremski suffered a slow, painful and totally preventable death.

349.   Defendant BURGESS' acts and omissions as outlined above were (1) of gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects; (2) of such entire want of care that would raise the presumption of conscious indifference; (3) show a wantonness or recklessness or a grossly careless disregard for the public's safety and welfare; or (4) done with reckless indifference to the rights of Mr. Obremski that is equivalent to an intentional violation of those rights. Therefore, Plaintiff is making a claim for punitive damages against Defendant BURGESS.

    **WHEREFORE**, PLAINTIFF demands judgment against BURGESS, for compensatory and punitive damages together with costs and prejudgment interest for that portion of the compensatory damages which have been previously liquidated, or damages under 46.021 and any other relief to which PLAINTIFFS may be entitled and PLAINTIFFS demand a trial by jury of all issues so triable.

Dated: 8/2/18

Respectfully submitted,

ATTORNEYS FOR PLAINTIFF

Greg Lauer, Esq.

Lauer & Currie, P.A.

644 Se 5 Avenue

Fort Lauderdale, Fl 33301

Phone:(954) 533-4498

Facsimile:(954) 533-4501

By:    *S/Greg M. Lauer*

Greg M. Lauer

Fla. Bar No. 652709

*greg@law-lc.com*

By*: S/Christina M. Currie*

Christina M. Currie

Fla. Bar No. 90987

*cmc@law-lc.com*