UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

CASE NO. 18-61798-CIV-RKA


ROSEMARIE OBREMSKI, ET AL.,      .
                                 .
                Plaintiff,       .  Fort Lauderdale, Florida
                                 .  February 12, 2020
                v.               .  2:17 p.m.
                                 .
ARMOR CORRECTIONAL HEALTH        .
SERVICES, INC.,                  .
                                 .
                Defendants.      .
. . . . . . . . . . . . . . .    .


- - - - -

Transcript of Motion Hearing had

before the Honorable Roy K. Altman,

United States District Judge.

- - - - -


Proceedings recorded by mechanical stenography, transcript
produced by computer.

```
APPEARANCES:

For the Plaintiff:     Greg McNeill Lauer, Esq.
                       Lauer & Currie, P.A.
                       644 SE 5th Avenue
                       Fort Lauderdale, Florida  33301

For the Defendants:    S. Renee S. Lundy, Esq.
                       Patricia M. Rego Chapman, Esq.
                       Dean Ringers Morgan & Lawton, P.A.
                       201 E. Pine Street
                       Suite 1200
                       Orlando, Florida  32801

Court Reporter:        Francine C. Salopek, RMR, CRR
                       Official Court Reporter
                       United States District Court
                       299 E. Broward Blvd., Room 207B
                       Fort Lauderdale, Florida 33301
                       (954)769-5686/mjsfcs@aol.com

                   -   -   -   -   -
```

```
 1              WEDNESDAY, FEBRUARY 12, 2020, 2:17 P.M.

 2              (The Judge entered the courtroom)

 3         THE COURT:  Good afternoon.

 4         Is this new counsel?

 5         MS. REGO CHAPMAN:  It is.

 6         MS. LUNDY:  Ms. Chapman is, yes, sir.

 7         THE COURT:  All right.

 8         LAW CLERK:  Calling Case Number 18-Civil-61798,

 9  Obremski vs. Armor Correctional Health Services, Inc., et al.

10         Counsel, please state your appearances for the record.

11         MR. LAUER:  Greg Lauer on behalf -- sorry -- Greg

12  Lauer on behalf of the plaintiff.

13         THE COURT:  Good afternoon, sir.

14         MR. LAUER:  Good afternoon.

15         MS. REGO CHAPMAN:  Patricia Rego Chapman on behalf of

16  the defendants.

17         THE COURT:  Good afternoon.

18         MS. LUNDY:  Renee Lundy on behalf of the defendants.

19         THE COURT:  Good afternoon to you.

20         I don't know why I remember the defense lawyer being a

21  man last time.

22         MS. LUNDY:  He was.

23         THE COURT:  Ah.  Okay.

24         MS. LUNDY:  And, your Honor --

25         THE COURT:  But it's the same firm.
```

1          MS. LUNDY:  He has left our firm.  He may still be

2     involved in the trial of the case, but Ms. Chapman is with our

3     firm.

4          THE COURT:  Understood.

5          Just give me one moment, if you don't mind.

6          MS. LUNDY:  Sure.

7          *(Pause)*

8          THE COURT:  All right.  We'll begin -- so we're here

9     on the two motions in limine.  I wanted to rule on them.  And

10    then we can work together to find a trial date, because the

11    current trial date isn't going to work for the Court.

12         So we'll start with the plaintiff's motion in limine.

13         The first aspect of the motion is to exclude any

14    reference -- excuse me -- as to how Mr. Obremski contracted

15    hepatitis C.  And I'll grant in part and deny in part that

16    aspect of the motion.  I'll deny it as to allow the defense to

17    use the defendant's *(sic)* course of conduct over the course of

18    his life, his alcoholism, his problems with keeping himself

19    healthy, obviously to show life expectancy.  It's plainly

20    relevant for that purpose.

21         The fact that he had hepatitis C -- I don't know

22    whether that shortens someone's life expectancy, no one said so

23    in the papers.  Does the defense have a view about that?

24         MS. LUNDY:  I believe it does, your Honor.  But our

25    experts will address that.

```
1         THE COURT:  Well, they either will or they won't.  My
2   point is, if the fact that somebody has hepatitis C doesn't
3   shorten someone's life expectancy, then I don't think it's
4   relevant at all.
5         MS. LUNDY:  Very good.
6         THE COURT:  I think what's relevant is, of course,
7   that he's a heavy drinker, he leads a very unhealthy life.  If
8   you want to talk about how he had french fries every day or
9   whatever, it's not in the motion, but if those are the kinds of
10  things you want to bring out, of course that's all plainly
11  relevant to show his life expectancy.  The fact that he had
12  hepatitis C is only relevant if hepatitis C, like eating french
13  fries every day or not sleeping well or drinking a lot,
14  likewise causes you to have a shorter life expectancy.  If it
15  does not, then I'll keep it out.  If it does, then I'll allow
16  it in only for that purpose.
17        The second thing is, of course, I'll allow it to show,
18  if there is such a showing, how his habits in life affected his
19  relationship with his family.  I think there's been a great
20  deal proffered with respect to that, and, of course, that's
21  plainly relevant to their damages.
22        So I'll allow it for those two limited purposes.  I'll
23  disallow it for any other purpose.  And like I said, my ruling
24  on the hepatitis C is contingent on that requirement.  Before
25  you bring out the fact of hepatitis C, at calendar call --
```

1    let's make a note -- Jim, drop this in a footnote in the

2    order -- at calendar call, I want both sides to update me on

3    your view about hepatitis C.  If the plaintiff comes in and

4    says there's no evidence that it shortens life expectancy, but

5    the defense has some credible evidence that it does, of course,

6    you're the one proffering it, I'm going to go along with your

7    proffer and allow you in good faith to ask the question.  If

8    both sides come in and say there's no evidence that hepatitis C

9    shortens your life expectancy, then, of course, we'll keep that

10   fact out.

11         The second aspect of the motion is to exclude any

12   reference to the following prior bad acts or undetected

13   criminal acts of Obremski.  The first one is that Mr. Obremski

14   may have been arrested in New York or New Jersey in the late

15   1980s or early '90s.  The defense doesn't oppose that aspect of

16   the motion, and so I'll grant it without objection.

17         The next one, B, is that Mr. Obremski kept guns in his

18   home -- bless you -- kept guns in his home before his arrest in

19   2016.  His gun ownership is not relevant, the plaintiff says,

20   to any matter in this case.

21         I'll grant with respect to that aspect.  It's not

22   relevant that he had guns.  What is relevant, though, is what

23   the defense of course says in their response.  It may be

24   relevant to impeach Danielle with this story about the pointing

25   of the gun in her face, re: their relationship with each other.

1    But only if she comes up and says, You know, we had a perfect

2    relationship, there was nothing -- you know, there was no

3    problem, we never had any conflicts," and opens the door in

4    that way.  If she comes in and says, "Look, we had a terrible

5    relationship," which I assume is what she will say in some

6    respects, "we had a bad relationship, bad things happened,"

7    then you're not really impeaching her.

8         So we'll have to see how that testimony plays out.

9    But I will -- so I will grant in part and deny in part that

10   aspect of the motion.  I don't think that the fact that a guy

11   owns guns impugns his ability to have a good relationship with

12   his daughter or his family.  I think the fact that a guy points

13   a gun in the face of his daughter probably does.

14        So the former, which is I think the subject of the

15   plaintiff's motion, is out.  The latter, which, frankly, he

16   doesn't really talk about in his motion, will be in assuming

17   that the testimony plays out as the defense supposes that it

18   will.  So I'll grant in part and deny in part B.

19        C is that Mr. Obremski allegedly drove under the

20   influence of drugs and/or alcohol before his arrest.  I was a

21   little confused by the response.  It seems to me the only way

22   that the defense knows this is from the son, who has, as I

23   understand it, some developmental issues, telling his sister

24   and his mom.  If the mom and the sister plan to come in and

25   say, "My son or brother told me," of course that's hearsay, and

1   it's excluded.

2           The only other mechanism by which that theoretically

3   could come in is through the son himself, and you block quote

4   from a portion of his deposition which you say suggests that he

5   was describing this particular incident.  But I've read it

6   several times, and he doesn't say that in the portion that you

7   quoted.

8           So I think, certainly, if the son came up and

9   testified, "He never did anything to endanger me, he never did

10  anything bad that I know of, he was always the most wonderful

11  father of all time," I think you have a good-faith basis to ask

12  him that question to impeach him on cross-examination.  But if

13  he never says anything like that, then you have no basis to ask

14  him.  If he comes in and says, "Yeah, we had a strained

15  relationship, he was a difficult guy, he had all these problems

16  with drinking," I don't know that it's so relevant at that

17  point.

18          In any event, even if you do get to impeach him, he'll

19  give you whatever answer he gives you, and then you'll likely

20  be stuck with that answer, because I don't know that you can

21  prove it any other way, other than by eliciting hearsay from

22  the sister and the mom, which of course will not be permitted.

23          So I'll grant that third aspect of the motion in part

24  and deny it in part, only allowing you to ask the question if

25  it impeaches something that he says on direct examination.

| | |
|---|---|
| 1 | And then number three, the last aspect of the motion |
| 2 | is any reference to the following prior bad act of Danielle |
| 3 | Obremski that she was arrested on a felony charge.  Of course, |
| 4 | I'm going to grant that aspect of the motion.  An arrest isn't |
| 5 | proof of anything at all.  It's also hearsay.  It's not |
| 6 | probative of anything, because, of course, in this country, |
| 7 | you're presumed innocent until you're proven guilty.  Since she |
| 8 | was never proven guilty, she's innocent, and, therefore, the |
| 9 | arrest doesn't show anything one way or the other. |
| 10 | So I think that resolves everything in the plaintiff's |
| 11 | motion.  Did I miss anything in your motion, sir? |
| 12 | MR. LAUER:  No, you did not, your Honor. |
| 13 | THE COURT:  Any questions about the plaintiff's |
| 14 | motion -- my rulings on the plaintiff's motion from the |
| 15 | plaintiff? |
| 16 | MR. LAUER:  Yeah, I actually had one question and |
| 17 | specifically dealing with how he contracted the HIV *(sic)*.  In |
| 18 | my -- |
| 19 | THE COURT:  HIV or hepatitis? |
| 20 | MR. LAUER:  I'm sorry, hepatitis C.  I'm sorry, Judge. |
| 21 | THE COURT:  Okay. |
| 22 | MR. LAUER:  It just appears in -- there's one single |
| 23 | sentence in all the thousands of medical records that we have, |
| 24 | and it just says he got hepatitis through intravenous drugs. |
| 25 | And that's what I was moving to have excluded.  I'd just like |

1   that one single sentence redacted, because I don't think that

2   that -- it doesn't matter whether he got it via sex, whether he

3   got it through drugs, whether it was a needle stick when he was

4   trying to help somebody who had hep C.  If they can show it's

5   relevant that hep C shortens your life, then hepatitis C, that

6   evidence can come in.  But how it was transmitted to him just

7   doesn't matter.

8          THE COURT:  Why not?  Isn't someone who uses

9   intravenous drugs likely to live less long than a person like

10  all of us, presumably, who doesn't use intravenous drugs?

11         MR. LAUER:  Arguably, but --

12         THE COURT:  Not arguably.  I mean that's a fact.

13         MR. LAUER:  Yeah, I would say yes, you're correct,

14  Judge.  But this is going back, you know, multiple decades.

15  We're talking the '80s or '90s here.  And under Rule 403, I

16  would say that it's more prejudicial than probative.  I think

17  that the probative value, if there is any, is substantially

18  outweighed by the unfair prejudice, because they're still

19  getting in the information that they want.  We're just removing

20  the, you know, evidence of a crime.  IV drug use is going to be

21  a crime.  And so I'm trying to get, you know, uncharged crimes

22  and prior bad acts to be, you know, sort of clean from this

23  record, while they still get their probative evidence in.

24         THE COURT:  Let me ask you, is there any evidence that

25  he was continuing to use intravenous drugs other than in this

1 one incident from the '80s?

2      MS. LUNDY: Not that I'm aware of, your Honor.

3      THE COURT: And is that what you want admitted, is the

4 fact of the intravenous drug use on one occasion, per this one

5 report, as opposed to the fact that he had hepatitis C?

6      MS. LUNDY: We want his lifestyle in general, is what

7 we're focusing on, your Honor.

8      THE COURT: Well, I mean that begs the question of

9 what in general we mean. I mean french fry eating or --

10      MS. LUNDY: No, we think intravenous drug use with

11 regard to this gentleman is relevant.

12      THE COURT: It's certainly relevant. The question is

13 whether if it -- if all you have is that it happened one time

14 in -- what year was that?

15      MR. LAUER: It was in the '80s or '90s, Judge. It was

16 before he had children. It was when he was living in

17 New Jersey. And I actually have the record, if you wanted to

18 take a look --

19      THE COURT: Yeah, let me take a look at it.

20      MR. LAUER: I'm going to approach, if that's okay.

21      So I highlighted up at the top, that's the part of it

22 that's --

23      THE COURT: Let me just look at it.

24      MR. LAUER: Sorry. And I'll explain.

25      THE COURT: And this is a medical record that's going

```
1    to come in through whom?
2          MR. LAUER:  That is going to be his medical record
3    from his last admission to the hospital, when he was
4    transferred from the jail directly to the hospital.
5          THE COURT:  And you're going to put this in?
6          MR. LAUER:  Probably not, no.
7          THE COURT:  But you're going to put it in through who?
8          MS. LUNDY:  Well, our experts have looked at it, not
9    saying it will come in through the experts, but we believe it
10   relevant.  We'll call a records custodian if need be, because
11   they do rely on it in forming their opinions.
12         THE COURT:  So you'll call a records custodian from
13   the hospital to put this record in as a business record.
14         MS. LUNDY:  If we need to, yes, sir.
15         THE COURT:  Okay.  I'm not going to exclude it now.  I
16   think it could be relevant and -- but I'll do it without
17   prejudice.  And so before that piece of evidence comes in --
18   let's put this in a footnote too, Jim -- before that piece of
19   evidence comes in, I want both sides to come sidebar.  You'll
20   tell me, "Hey, Judge, this is the moment where I want to put in
21   this piece of evidence."  I'll see where we are in the trial,
22   how things have gone.  If you've got 90 other examples of this
23   guy leading an extremely unhealthy life, which it sounds like
24   you will, already, its marginal probative value is probably at
25   that point far outweighed by its prejudicial effect.
```

1        So I won't keep it out carte blanche right now, but I

2  want both sides to alert me before it comes in.  Okay?

3        MS. LUNDY:  Yes, sir.

4        MR. LAUER:  Yes, sir.

5        THE COURT:  All right.  That's the plaintiff's motion

6  in limine.  We move to the defendants' motion.

7        All right.  This question of contemporaneous or

8  subsequent inmate deaths, which is the first aspect of the

9  motion, very interesting question.  I've read all of the cases

10  cited by both sides.  You both have it wrong, interestingly

11  enough.

12        There are two elements to a *Monell* claim.  One is that

13  there's a policy or a custom.  The second is that the policy or

14  custom caused the injury or death.

15        And so, first of all, Mr. Burrell -- I think is how

16  you pronounce it -- Mr. Burrell died before Mr. Obremski,

17  right?  Is that conceded?

18        MS. LUNDY:  Yes, sir.

19        THE COURT:  So the issue is not relevant as to

20  Burrell, right?  So it's only as to Farrah, correct?

21        MS. REGO CHAPMAN:  We're arguing that it's

22  contemporaneous, but --

23        THE COURT:  It's not contemporaneous.  We need to use

24  English words according to their plain meaning.

25  Contemporaneous means at the same time.  This is four days

1  before.  It's not contemporaneous.  So Burrell is not -- and

2  maybe it's the subject of your motion, but if it is, your

3  motion is denied as to Burrell, who died four days before

4  Mr. Obremski.

5         As to Mr. Farrah, of course Mr. Farrah's death, which

6  is the defense's point, cannot be used to have put the city --

7  or the county, as the case may be in this case, on notice.

8  That's plain.  And all of the cases that the defense cites are

9  on point for that proposition.  It happened after.  So it can't

10  have put him on notice, so it can't have caused the *Monell*

11  violation, if there was a *Monell* violation.

12         However, as the plaintiff's cases likewise make clear,

13  it can be circumstantial evidence of the first element, that

14  there was a policy or custom.  So the question becomes, first

15  of all, what is the policy or custom that he's alleging?  Now,

16  this became an issue at the summary judgment briefing and in

17  the argument.  And he alleges, as I understand it, that you had

18  an unduly restrictive view of what kind of ailments required

19  hospitalization.  He cites to a particular written policy and

20  also says that there was kind of an unspoken policy or custom

21  in the prison or jail that unless you essentially were like

22  bleeding out, you weren't going to get sent to the hospital,

23  that that was the policy.

24         I don't remember what his name was but the gentleman

25  who was arguing for you quibbled with his characterization of

1    that as a policy.  In other words, quibbled with the existence

2    of the policy, element one.  If that's going to be your

3    position at trial, that there was no policy, then, of course,

4    that second death could become circumstantial -- excuse me --

5    that ninth death could be circumstantial evidence, if it's

6    similar enough, of the existence of a policy earlier than that

7    happening.

8              In other words, if he were able to tie it together to

9    say, here's a guy who had very similar symptoms to

10   Mr. Obremski, here's a guy who should have been sent to the

11   hospital at an earlier point in time, just as Mr. Obremski, but

12   solely by virtue of this unduly restrictive policy that you

13   had, he was not, then he can show that unless there was a

14   change in policy in the intervening period -- and I'm trying to

15   remember how much time passed between Obremski and Farrah.

16             MR. LAUER:  Forty-four days.

17             THE COURT:  Forty-four days.  So unless either you or

18   he would show, presumably you, that there was some intervening

19   act between Obremski's death and Farrah's death where the

20   policy was changed, then I think that's pretty powerful

21   circumstantial evidence that the policy that led to

22   Mr. Farrah's death existed 44 days prior.  And that's the

23   holding of the First Circuit and Second Circuit cases that he

24   cites.

25             I love Judge Hunt.  I'm not relying on Judge Hunt for

```
 1    this.  I just want to be clear for the record.  He's my paired
 2    magistrate judge.  I am relying, though, on the circuit court
 3    cases that he cited that stand for this proposition.
 4    Specifically, I'm relying on Jones vs. Town of East Haven,
 5    which is a Second Circuit case, 691 F.3d 72, from 2012;
 6    Bordanaro, B-O-R-D-A-N-A-R-O vs. McLeod, M-C-L-E-O-D,
 7    871 F.2d 1151, and that is a First Circuit case from 1989, both
 8    of which make this pretty commonsensical point.
 9             As to the second element, you're correct, it's totally
10    not relevant.  As to the first element, it could be relevant if
11    there's a showing that it's similar enough, and that there was
12    no intervening change in policy between the death in question
13    and the subsequent death.
14             So that all begs the question, of course, is
15    Mr. Farrah's death going to be admissible.  The answer is I
16    don't know.  Because we need to have a proffer about the
17    similarities or differences between each of these eight deaths
18    and Mr. Obremski's death.  But in any event, it doesn't really
19    matter now, because if I recall correctly, I think I bifurcated
20    the case between the substantive -- not the substantive, but
21    whether or not Mr. Obremski's death was caused by the
22    defendants, and then separately, if yes, then a second trial on
23    Monell, and then a third trial, if we get there, on punitive
24    damages.  I think that's how I broke it up, correct?
25             MR. LAUER:  Correct.
```

1              THE COURT:  So this issue -- tell me if I'm wrong --

2     will only ever come up if we get to the second phase of the

3     trial, correct?

4              MR. LAUER:  Correct.

5              MS. LUNDY:  Correct.

6              THE COURT:  Is that right?

7              So I'm going to deny the motion as to Burrell and deny

8     it as to Farrah without prejudice.  And I say without prejudice

9     as to both because between the first trial and the second

10    trial, if we get there, I'm going to have, of course, both

11    parties proffer to me outside the presence of the jury your

12    separate feelings about the other eight individuals.  That's an

13    aspect of the motion in limine, which, as you can imagine, I'm

14    going to deny without prejudice based on this ruling.  We'll do

15    the first trial.  No -- none of these eight incidents will come

16    in during the first trial.

17             If there's no liability, it's a moot point, and we all

18    go home.  If there is, then, of course, we move on to the

19    second phase.  But before we do so, both sides will proffer to

20    me their view of the similarities and differences.  You don't

21    have to give me any proffer at that point of what Mr. Obremski

22    died of, because I'll already have a very firm grasp on that

23    having reviewed the evidence here at trial.

24             So I'll deny without prejudice this first aspect of

25    the motion.  Any questions about that?

1      MR. LAUER:  No.

2      MS. REGO CHAPMAN:  No, your Honor.

3      THE COURT:  The second aspect of the motion is the

4  termination of Dr. Frankowitz.  I don't see why it's relevant.

5  Your argument is -- two things:  One, that the termination of

6  Dr. Frankowitz suggests that Armor tolerated the misconduct.

7  But to the contrary, the termination of Dr. Frankowitz,

8  particularly at the first trial where they're not going to hear

9  about any prior incidents, only suggests that they didn't

10  tolerate the conduct, in which case, of course, the termination

11  of Dr. Frankowitz is directly the opposite of the police report

12  case that you cited in your papers.

13      Secondly, you say that the fact that they terminated

14  Dr. Frankowitz suggests that they tolerated the conduct of the

15  nurses.  But, of course, it suggests no such thing.  And in any

16  event, as I alluded at the hearing, the nurses aren't going to

17  be here, at least for Eighth Amendment claims.  I'm entering

18  summary judgment, having of course issued the order.  But there

19  is no evidence that any of the nurses engaged in any

20  deliberately indifferent conduct with respect to Mr. Obremski.

21  And so the nurses aren't going to be here at the trial.

22      So I just don't think that the termination of

23  Dr. Frankowitz is relevant to the case.

24      I'll grant the motion, therefore, without prejudice.

25  And I say without prejudice, of course, because if during the

1    trial, you think they've opened the door to some aspect of that

2    fact, for example, Oh, he's a stellar employee who never got in

3    trouble, he never did anything wrong, we never thought he was

4    in the wrong, we thought he did everything a hundred percent

5    right, of course, then they'll have opened the door, and you'll

6    be able to bring that evidence in.

7            All right.  The next aspect of the motion, the third

8    aspect, is this evidence of inmates -- the other eight inmates,

9    whether they're substantially similar enough under the law.  Of

10   course, I've read those cases.  And I think it's fair to say

11   that they need to be substantially similar but perhaps not as

12   identical as the defense needs them to be.  But that's not

13   neither here nor there.  I'll deny that aspect of the motion,

14   as I said, without prejudice, because it's neither here nor

15   there for the first phase of the trial.  And then we'll have a

16   proffer outside the presence of the jury, not lengthy, maybe

17   30 minutes or so, to discuss which ones of those eight will

18   come in.

19           As I talked about at the summary judgment hearing, my

20   feeling is there are some number of those eight that should

21   come in, if we get to a *Monell* hearing, based on the symptoms

22   they had and what they died of.  It may be that not all of the

23   eight should come in, and you all will remember I think that

24   discussion that we had at the summary judgment.  So I'll deny

25   without prejudice that part of the motion.

```
1              And then the last one is this question of the
2     financial worth evidence, other than current net worth.  This
3     seems to me an issue for cross-examination.  Of course, if we
4     get to the punitive damages phase, which is where this is
5     relevant, that's phase three of the trial.  So we're getting
6     ahead of ourselves.  For the first phase, this is not relevant
7     it's not coming in, we all agree.  For the second phase, it's
8     not relevant, it's not coming in, we all agree.  This is only
9     relevant for the third phase of the trial, if we get there.
10             I'll allow both sides to make limited argument on this
11    point outside the presence of the jury before the third phase,
12    if we're there, so that we can rehash this issue with more
13    specificity at that time.
14             I note in that respect that Judge Hunt issued an
15    order, I think this morning or last night, on discovery
16    relating to this precise question.  So it may be that even you
17    all don't have all the answers on what the contours of this
18    dispute is all about.  So I will deny this aspect -- excuse
19    me -- grant this aspect of the motion and say the plaintiff of
20    course can argue what he argues in his response, that those
21    liabilities that you're saying devalue the extent of your net
22    worth are bogus, and all the reasons why they think they aren't
23    true liabilities that the jury shouldn't consider.  That seems
24    to me proper cross-examination.  Or if they want to put on
25    evidence at that third phase that demonstrates that those
```

```
 1   liabilities are bogus, of course they'll be permitted to, and I
 2   think this is a question of weight that the jury should give to
 3   this information, not of admissibility.  That's my initial
 4   take.
 5           And so I guess the ruling is, both sides will be able
 6   to present their own view of what the defendants' net worth is,
 7   if we get there.  The defense with all its liabilities, and the
 8   plaintiff with his reasons as to why those liabilities should
 9   be discounted.  So in that respect, I won't exclude the net
10   worth that the defendants have provided as currently
11   constituted, and so I'll grant that aspect of the motion
12   without prejudice.
13           I think that resolves all aspects of the defense
14   motion in limine.  Any questions about my rulings on any of
15   those?
16           MR. LAUER:  No, not from the plaintiff.
17           MS. REGO CHAPMAN:  No, your Honor.
18           THE COURT:  Okay.  Great.
19           So where does that leave us?  We've got a trial date
20   in March, I believe.  But my trial calendar is pretty booked
21   up, and I've got two trials next week, then I'm out of town
22   for -- in D.C. last week of February, then I've got a trial the
23   week I get back, first week of March, and then I've got a bunch
24   of summary judgment orders I need to get out the next
25   three weeks of March, including this one.  So I think probably
```

```
 1   we're looking at April or May.  ToniAnn isn't here, so it's
 2   hard for me to do the schedule today.  But tell me your
 3   preferences on April or May.
 4           MR. LAUER:  Judge, as far as the plaintiff goes, I
 5   have no conflicts between my partners, my wife, and myself
 6   personally.  My only concern is that I have experts who, you
 7   know, may have prior obligations.  That's the only reason I
 8   would not be available for any specific date.  But I don't know
 9   their schedules right now.
10           THE COURT:  All right.  And what about the defense?
11           MS. LUNDY:  We are in the same position, although my
12   son is graduating from high school on May 22nd, your Honor.
13           THE COURT:  Wow!  Congratulations.
14           MS. LUNDY:  Thank you very much.  I'd like to be
15   there, so --
16           THE COURT:  You will be there.  No doubt about that.
17           Okay.  So I will take that into account.  What I think
18   maybe makes sense, in light of what you just said, is to push
19   it off a little bit further, and that way if there's any
20   conflict, we have enough time to rectify it.  So if your
21   experts -- either side's experts can't do the first week of May
22   or second week of May, you just file a motion to continue.  It
23   should be unopposed, because I'll grant it.  And so I'll push
24   it off to a date when -- just let me know in the motion how
25   long your experts are unavailable for, and I'll push it off to
```

1    a point where hopefully everybody's experts can be available.

2              MR. LAUER:  With the last hearing we had at summary

3    judgment, Judge, you had asked us to give you dates when our

4    experts are available, and I was able to tie them down.  You

5    know, there was only maybe a 15-day period over a four-month

6    period where they were not available.  Could we do that again

7    and --

8              THE COURT:  Do it again.  That sounds great.  Why

9    don't you do that -- can you do that by tomorrow?

10             MR. LAUER:  I'll email them when I get back to my

11   office.  I don't see why not.

12             THE COURT:  What about you?

13             MS. LUNDY:  Yes, sir, be glad to.  And I don't know

14   what your preference is, but I also have a vacation planned in

15   the summertime.

16             THE COURT:  You're going on vacation.  That's my

17   preference.  So when is your vacation?

18             MS. LUNDY:  June 29th.

19             THE COURT:  Oh, I don't think we're going to push it

20   off that far.

21             MS. LUNDY:  That's fine.

22             THE COURT:  But why don't you do this.  Tomorrow is

23   Thursday.  Why don't by Friday you all submit a joint

24   scheduling conflict list, where you tell me about your -- the

25   graduation, the vacations, the experts' availability, and we'll

1   work on getting a trial date that works for everybody.

2            MS. LUNDY:  Very good.  Thank you, Judge.

3            THE COURT:  Okay?

4            MS. LUNDY:  Yes, sir.

5            MR. LAUER:  Works for --

6            THE COURT:  All right.  Anything else then from the

7   plaintiff?

8            MR. LAUER:  No.  That's everything from the plaintiff.

9   Thank you.

10           THE COURT:  Anything else from the defense?

11           MS. LUNDY:  No, sir.  Thank you.

12           THE COURT:  All right.  Thank you all very much.  Have

13   a good day.

14           *(The Judge exited the courtroom)*

15           *(Proceedings concluded at 2:48 p.m.)*

16                          -  -  -  -  -

17

18               C E R T I F I C A T E

19       I hereby certify that pursuant to Section 753,

20   Title 28, United States Code, the foregoing is a true and

21   correct transcript from the record of proceedings in the

22   above-entitled matter.

23

        /s/Francine C. Salopek                 8-13-2021
24   Francine C. Salopek, RMR-CRR              Date
     Official Court Reporter
25

LAW CLERK: [1]  3/8
MR. LAUER: [24]
MS. LUNDY: [24]
MS. REGO CHAPMAN: [5]
THE COURT: [47]

'

'80s [3]  10/15 11/1 11/15
'90s [3]  6/15 10/15 11/15

/

/s/Francine [1]  24/23

1

1151 [1]  16/7
12 [2]  1/7 3/1
1200 [1]  2/6
15-day [1]  23/5
18-61798-CIV-RKA [1]  1/4
1980s [1]  6/15
1989 [1]  16/7

2

201 [1]  2/6
2012 [1]  16/5
2016 [1]  6/19
2020 [2]  1/7 3/1
2021 [1]  24/23
207B [1]  2/9
22nd [1]  22/12
28 [1]  24/20
299 [1]  2/9
29th [1]  23/18
2:17 [2]  1/7 3/1
2:48 [1]  24/15

3

30 minutes [1]  19/17
32801 [1]  2/7
33301 [2]  2/3 2/10

4

403 [1]  10/15
44 days [1]  15/22

5

5th [1]  2/3

6

61798 [1]  3/8
644 [1]  2/3
691 F.3d 72 [1]  16/5

7

72 [1]  16/5
753 [1]  24/19
769-5686/mjsfcs [1]  2/10

8

8-13-2021 [1]  24/23
871 F.2d 1151 [1]  16/7

9

90 [1]  12/22

954 [1]  2/10

A

ability [1]  7/11
above [1]  24/22
above-entitled [1]  24/22
according [1]  13/24
account [1]  22/17
act [2]  9/2 15/19
acts [3]  6/12 6/13 10/22
address [1]  4/25
admissibility [1]  21/3
admissible [1]  16/15
admission [1]  12/3
admitted [1]  11/3
affected [1]  5/18
afternoon [5]
agree [2]  20/7 20/8
Ah [1]  3/23
ailments [1]  14/18
al [2]  1/5 3/9
alcohol [1]  7/20
alcoholism [1]  4/18
alert [1]  13/2
allegedly [1]  7/19
alleges [1]  14/17
alleging [1]  14/15
allow [6]
allowing [1]  8/24
alluded [1]  18/16
although [1]  22/11
Altman [1]  1/14
Amendment [1]  18/17
answer [3]  8/19 8/20 16/15
answers [1]  20/17
aol.com [1]  2/10
appearances [2]  2/1 3/10
approach [1]  11/20
April [2]  22/1 22/3
aren't [3]  18/16 18/21 20/22
arguably [2]  10/11 10/12
argue [1]  20/20
argues [1]  20/20
arguing [2]  13/21 14/25
argument [3]  14/17 14/18 15/20/10
ARMOR [3]  1/8 3/9 18/6
arrest [4]  6/18 7/20 9/4 9/9
arrested [2]  6/14 9/3
aspect [20]
aspects [1]  21/13
assume [1]  7/5
assuming [1]  7/16
availability [1]  23/25
Avenue [1]  2/3
aware [1]  11/2

B

B-O-R-D-A-N-A-R-O vs. McLeod [1]  16/6
basis [2]  8/11 8/13
becomes [1]  14/14
begin [1]  4/8
begs [2]  11/8 16/14
believe [3]  4/24 12/9 21/20
bifurcated [1]  16/19

blanche [1]  13/1
bleeding [1]  14/22
bless [1]  6/18
block [1]  8/3
Blvd [1]  2/9
bogus [2]  20/22 21/1
booked [1]  21/20
Bordanaro [1]  16/6
briefing [1]  14/16
broke [1]  16/24
brother [1]  7/25
Broward [1]  2/9
bunch [1]  21/23
Burrell [6]
business [1]  12/13

C

calendar [3]  5/25 6/2 21/20
call [4]  5/25 6/2 12/10 12/12
Calling [1]  3/8
carte [1]  13/1
caused [3]  13/14 14/10 16/21
causes [1]  5/14
certify [1]  24/19
Chapman [4]  2/5 3/6 3/15 4/2
characterization [1]  14/25
charge [1]  9/3
children [1]  11/16
circuit [5]
circumstantial [4]  14/13 15/4 15/5 15/21
cited [3]  13/10 16/3 18/12
cites [3]  14/8 14/19 15/24
city [1]  14/6
CIV [1]  1/4
Civil [1]  3/8
claim [1]  13/12
claims [1]  18/17
clean [1]  10/22
clear [2]  14/12 16/1
Code [1]  24/20
commonsensical [1]  16/8
computer [1]  1/25
conceded [1]  13/17
concern [1]  22/6
concluded [1]  24/15
conduct [4]  4/17 18/10 18/14 18/20
conflict [2]  22/20 23/24
conflicts [2]  7/3 22/5
confused [1]  7/21
Congratulations [1]  22/13
constituted [1]  21/11
contemporaneous [5]
contingent [1]  5/24
continuing [1]  10/25
contours [1]  20/17
contracted [2]  4/14 9/17
contrary [1]  18/7
CORRECTIONAL [2]  1/8 3/9
counsel [2]  3/4 3/10
country [1]  9/6
county [1]  14/7
court [7]
courtroom [2]  3/2 24/14
credible [1]  6/5

**C**

crime [2]  10/20 10/21
crimes [1]  10/21
criminal [1]  6/13
cross [3]  8/12 20/3 20/24
cross-examination [3]  8/12 20/3 20/24
CRR [2]  2/8 24/24
Currie [1]  2/2
custodian [2]  12/10 12/12
custom [5]

**D**

D.C [1]  21/22
damages [3]  5/21 16/24 20/4
Danielle [2]  6/24 9/2
date [7]
dates [1]  23/3
daughter [2]  7/12 7/13
Dean [1]  2/5
death [12]
deaths [2]  13/8 16/17
decades [1]  10/14
defendant's [1]  4/17
defendants [6]
defendants' [2]  13/6 21/6
defense [14]
defense's [1]  14/6
deliberately [1]  18/20
demonstrates [1]  20/25
denied [1]  14/3
deny [12]
deposition [1]  8/4
describing [1]  8/5
devalue [1]  20/21
developmental [1]  7/23
died [4]  13/16 14/3 17/22 19/22
differences [2]  16/17 17/20
difficult [1]  8/15
direct [1]  8/25
directly [2]  12/4 18/11
disallow [1]  5/23
discounted [1]  21/9
discovery [1]  20/15
discuss [1]  19/17
discussion [1]  19/24
dispute [1]  20/18
DISTRICT [4]  1/1 1/2 1/15 2/9
DIVISION [1]  1/3
door [3]  7/3 19/1 19/5
doubt [1]  22/16
Dr. [6]
Dr. Frankowitz [6]
drinker [1]  5/7
drinking [2]  5/13 8/16
drop [1]  6/1
drove [1]  7/19
drug [3]  10/20 11/4 11/10
drugs [6]

**E**

early [1]  6/15
East [1]  16/4
East Haven [1]  16/4
eating [2]  5/12 11/9

effect [1]  12/25
eight [7]
Eighth [1]  18/17
element [4]  14/13 15/2 16/9 16/10
elements [1]  13/12
eliciting [1]  8/21
email [1]  23/10
employee [1]  19/2
endanger [1]  8/9
engaged [1]  18/19
English [1]  13/24
entitled [1]  22/22
Esq [3]  2/2 2/4 2/5
essentially [1]  14/21
et [2]  1/5 3/9
et al [1]  3/9
event [3]  8/18 16/18 18/16
everybody [1]  24/1
everybody's [1]  23/1
evidence [19]
examination [4]  8/12 8/25 20/3 20/24
examples [1]  12/22
exclude [4]  4/13 6/11 12/15 21/9
excluded [2]  8/1 9/25
excuse [3]  4/14 15/4 20/18
existed [1]  15/22
existence [2]  15/1 15/6
exited [1]  24/14
expectancy [7]
experts [9]
experts' [1]  23/25
explain [1]  11/24
extent [1]  20/21
extremely [1]  12/23

**F**

F.2d [1]  16/7
F.3d [1]  16/5
face [2]  6/25 7/13
fact [12]
faith [2]  6/7 8/11
family [2]  5/19 7/12
Farrah [4]  13/20 14/5 15/15 17/8
Farrah's [4]  14/5 15/19 15/22 16/15
father [1]  8/11
February [3]  1/7 3/1 21/22
feelings [1]  17/12
felony [1]  9/3
file [1]  22/22
financial [1]  20/2
fine [1]  23/21
firm [4]  3/25 4/1 4/3 17/22
FLORIDA [5]
focusing [1]  11/7
footnote [2]  6/1 12/18
foregoing [1]  24/20
former [1]  7/14
FORT [4]  1/3 1/6 2/3 2/10
Forty [2]  15/16 15/17
Forty-four [2]  15/16 15/17
four days [2]  13/25 14/3
four-month [1]  23/5
Francine [3]  2/8 24/23 24/24
frankly [1]  7/15
Frankowitz [6]

french [3]  5/8 5/12 11/9
Friday [1]  23/23
fries [2]  5/8 5/13
fry [1]  11/9

**G**

general [2]  11/6 11/9
gentleman [2]  11/11 14/24
gives [1]  8/19
glad [1]  23/13
good-faith [1]  8/11
graduating [1]  22/12
graduation [1]  23/25
grant [11]
grasp [1]  17/22
great [3]  5/19 21/18 23/8
Greg [3]  2/2 3/11 3/11
guilty [2]  9/7 9/8
gun [3]  6/19 6/25 7/13
guns [4]  6/17 6/18 6/22 7/11

**H**

habits [1]  5/18
Haven [1]  16/4
he'll [1]  8/18
HEALTH [2]  1/8 3/9
healthy [1]  4/19
hear [1]  18/8
hearing [5]
hearsay [3]  7/25 8/21 9/5
heavy [1]  5/7
help [1]  10/4
hep [2]  10/4 10/5
hep C [2]  10/4 10/5
hepatitis [14]
hepatitis C [12]
here's [2]  15/9 15/10
hereby [1]  24/19
Hey [1]  12/20
high [1]  22/12
highlighted [1]  11/21
HIV [2]  9/17 9/19
holding [1]  15/23
home [3]  6/18 6/18 17/18
Honor [8]
Honorable [1]  1/14
hopefully [1]  23/1
hospital [5]
hospitalization [1]  14/19
hundred [1]  19/4
Hunt [3]  15/25 15/25 20/14

**I**

I'd [2]  9/25 22/14
I'll [25]
I'm [17]
I've [6]
identical [1]  19/12
imagine [1]  17/13
impeach [3]  6/24 8/12 8/18
impeaches [1]  8/25
impeaching [1]  7/7
impugns [1]  7/11
in limine [5]
INC [2]  1/9 3/9

**I**

incident [2]  8/5 11/1
incidents [2]  17/15 18/9
including [1]  21/25
indifferent [1]  18/20
individuals [1]  17/12
influence [1]  7/20
information [2]  10/19 21/3
initial [1]  21/3
injury [1]  13/14
inmate [1]  13/8
inmates [2]  19/8 19/8
innocent [1]  9/7 9/8
intervening [3]  15/14 15/18 16/12
intravenous [6]
issue [5]
issued [2]  18/18 20/14
issues [1]  7/23
IV [1]  10/20

**J**

jail [2]  12/4 14/21
Jersey [2]  6/14 11/17
Jim [2]  6/1 12/18
joint [1]  23/23
Jones [1]  16/4
Jones vs. Town [1]  16/4
judge [14]
Judge Hunt [3]  15/25 15/25 20/14
judgment [6]
June [1]  23/18
June 29th [1]  23/18
jury [5]

**K**

keep [3]  5/15 6/9 13/1
keeping [1]  4/18
kinds [1]  5/9
knows [1]  7/22

**L**

late [1]  6/14
latter [1]  7/15
LAUDERDALE [4]  1/3 1/6 2/3 2/10
Lauer [4]  2/2 2/2 3/11 3/12
law [4]  19/9
Lawton [1]  2/5
lawyer [1]  3/20
leading [1]  12/23
leads [1]  5/7
leave [1]  21/19
led [1]  15/21
lengthy [1]  19/16
liabilities [5]
liability [1]  17/17
life [12]
lifestyle [1]  11/6
light [1]  22/18
limine [5]
limited [1]  5/22 20/10
list [1]  23/24
love [1]  15/25
Lundy [2]  2/4 3/18

**M**

M-C-L-E-O-D [1]  16/6
magistrate [1]  16/2
man [1]  3/21
March [3]  21/20 21/23 21/25
marginal [1]  12/24
matter [5]
May 22nd [1]  22/12
McLeod [1]  16/6
McNeill [1]  2/2
mean [4]  10/12 11/8 11/9 11/9
meaning [1]  13/24
means [1]  13/25
mechanical [1]  1/24
mechanism [1]  8/2
medical [3]  9/23 11/25 12/2
minutes [1]  19/17
misconduct [1]  18/6
miss [1]  9/11
mjsfcs [1]  2/10
mom [3]  7/24 7/24 8/22
moment [2]  4/5 12/20
Monell [5]
month [1]  23/5
moot [1]  17/17
Morgan [1]  2/5
morning [1]  20/15
motion [35]
motions [1]  4/9
move [2]  13/6 17/18
moving [1]  9/25
Mr. [18]
Mr. Burrell [2]  13/15 13/16
Mr. Farrah [1]  14/5
Mr. Farrah's [3]  14/5 15/22 16/15
Mr. Obremski [10]
Mr. Obremski's [2]  16/18 16/21
Ms. [2]  3/6 4/2
Ms. Chapman [2]  3/6 4/2
multiple [1]  10/14

**N**

name [1]  14/24
needle [1]  10/3
neither [2]  19/13 19/14
net [2]  20/2 20/21 21/6 21/9
New Jersey [2]  6/14 11/17
New York [1]  6/14
ninth [1]  15/5
none [1]  17/15
note [2]  6/1 20/14
notice [2]  14/7 14/10
number [3]  3/8 9/1 19/20
Number 18-Civil-61798 [1]  3/8
nurses [4]  18/15 18/16 18/19 18/21

**O**

objection [1]  6/16
obligations [1]  22/7
OBREMSKI [15]
Obremski vs. Armor [1]  3/9
Obremski's [3]  15/19 16/18 16/21
occasion [1]  11/4
office [1]  23/11

Official [2]  2/8 24/24
Oh [2]  19/2 23/19
opinions [1]  12/11
oppose [1]  6/15
opposed [1]  11/5
opposite [1]  18/11
order [3]  6/2 18/18 20/15
orders [1]  21/24
Orlando [1]  2/7
outweighed [2]  10/18 12/25
ownership [1]  6/19
owns [1]  7/11

**P**

P.A [2]  2/2 2/5
p.m [3]  1/7 3/1 24/15
paired [1]  16/1
papers [2]  4/23 18/12
part [10]
parties [1]  17/11
partners [1]  22/5
passed [1]  15/15
Patricia [2]  2/5 3/15
Pause [1]  4/7
percent [1]  19/4
perfect [1]  7/1
perhaps [1]  19/11
period [3]  15/14 23/5 23/6
permitted [2]  8/22 21/1
person [1]  10/9
personally [1]  22/6
phase [10]
piece [3]  12/17 12/18 12/21
Pine [1]  2/6
plain [2]  13/24 14/8
plainly [3]  4/19 5/10 5/21
plaintiff [12]
plaintiff's [7]
plan [1]  7/24
planned [1]  23/14
plays [2]  7/8 7/17
point [11]
pointing [1]  6/24
points [1]  7/12
police [1]  18/11
policy [16]
portion [2]  8/4 8/6
position [2]  15/3 22/11
powerful [1]  15/20
precise [1]  20/16
preference [2]  23/14 23/17
preferences [1]  22/3
prejudice [11]
prejudicial [2]  10/16 12/25
presence [3]  17/11 19/16 20/11
present [1]  21/6
presumed [1]  9/7
prison [1]  14/21
probative [5]
problem [1]  7/3
problems [2]  4/18 8/15
proceedings [3]  1/24 24/15 24/21
produced [1]  1/25
proffer [6]
proffered [1]  5/20

**P**

proffering [1]  6/6
pronounce [1]  13/16
proof [1]  9/5
proper [1]  20/24
proposition [2]  14/9 16/3
prove [1]  8/21
proven [2]  9/7 9/8
provided [1]  21/10
punitive [2]  16/23 20/4
purposes [1]  5/22
pursuant [1]  24/19
push [4]  22/18 22/23 22/25 23/19

**Q**

question [14]
questions [3]  9/13 17/25 21/14
quibbled [2]  14/25 15/1
quote [1]  8/3
quoted [1]  8/7

**R**

re [1]  6/25
read [3]  8/5 13/9 19/10
reasons [2]  20/22 21/8
recall [1]  16/19
record [9]
recorded [1]  1/24
records [3]  9/23 12/10 12/12
rectify [1]  22/20
redacted [1]  10/1
reference [3]  4/14 6/12 9/2
Rego [2]  2/5 3/15
rehash [1]  20/12
relationship [7]
relevant [25]
rely [1]  12/11
relying [3]  15/25 16/2 16/4
remember [4]  3/20 14/24 15/15 19/23
removing [1]  10/19
Renee [2]  2/4 3/18
report [2]  11/5 18/11
Reporter [3]  2/8 2/8 24/24
required [1]  14/18
requirement [1]  5/24
resolves [2]  9/10 21/13
response [3]  6/23 7/21 20/20
restrictive [2]  14/18 15/12
reviewed [1]  17/23
Ringers [1]  2/5
RKA [1]  1/4
RMR [2]  2/8 24/24
RMR-CRR [1]  24/24
Room [1]  2/9
ROSEMARIE [1]  1/5
Roy [1]  1/14
rule [2]  4/9 10/15
Rule 403 [1]  10/15
ruling [3]  5/23 17/14 21/5
rulings [2]  9/14 21/14

**S**

Salopek [3]  2/8 24/23 24/24
schedule [1]  22/2

schedules [1]  22/9
scheduling [1]  23/24
school [1]  22/12
SE [1]  2/3
second [14]
Section [1]  24/19
sense [1]  22/18
sentence [2]  9/23 10/1
SERVICES [1]  1/9
Services, [1]  3/9
Services, Inc [1]  3/9
sex [1]  10/2
shorten [1]  5/3
shortens [4]  4/22 6/4 6/9 10/5
shorter [1]  5/14
sic [2]  4/17 9/17
side's [1]  22/21
sidebar [1]  12/19
sides [8]
similarities [2]  16/17 17/20
single [2]  9/22 10/1
sister [3]  7/23 7/24 8/22
sleeping [1]  5/13
solely [1]  15/12
someone's [2]  4/22 5/3
son [5]
sounds [2]  12/23 23/8
SOUTHERN [1]  1/2
specific [1]  22/8
specificity [1]  20/13
stand [1]  16/3
state [1]  3/10
STATES [4]  1/1 1/15 2/9 24/20
stellar [1]  19/2
stenography [1]  1/24
stick [1]  10/3
story [1]  6/24
strained [1]  8/14
Street [1]  2/6
stuck [1]  8/20
subject [2]  7/14 14/2
submit [1]  23/23
subsequent [2]  13/8 16/13
substantially [3]  10/17 19/9 19/11
substantive [2]  16/20 16/20
suggests [5]
Suite [1]  2/6
summary [6]
summertime [1]  23/15
symptoms [2]  15/9 19/21

**T**

take [4]  11/18 11/19 21/4 22/17
talk [2]  5/8 7/16
talked [1]  19/19
talking [1]  10/15
tell [4]  12/20 17/1 22/2 23/24
telling [1]  7/23
terminated [1]  18/13
termination [5]
terrible [1]  7/4
testified [1]  8/9
testimony [2]  7/8 7/17
Thank [5]
theoretically [1]  8/2

think [28]
thought [2]  19/3 19/4
thousands [1]  9/23
three weeks [1]  21/25
Thursday [1]  23/23
tie [2]  15/8 23/4
time [8]
times [1]  8/6
Title [1]  24/20
tolerate [1]  18/10
tolerated [2]  18/6 18/14
ToniAnn [1]  22/1
top [1]  11/21
totally [1]  16/9
town [2]  16/4 21/21
transcript [3]  1/13 1/24 24/21
transferred [1]  12/4
transmitted [1]  10/6
trial [23]
trials [1]  21/21
trouble [1]  19/3
true [2]  20/23 24/20

**U**

unavailable [1]  22/25
uncharged [1]  10/21
understand [2]  7/23 14/17
Understood [1]  4/4
undetected [1]  6/12
unduly [2]  14/18 15/12
unfair [1]  10/18
unhealthy [2]  5/7 12/23
UNITED [4]  1/1 1/15 2/9 24/20
unless [3]  14/21 15/13 15/17
unopposed [1]  22/23
unspoken [1]  14/20
update [1]  6/2
us [3]  10/10 21/19 23/3

**V**

vacation [3]  23/14 23/16 23/17
vacations [1]  23/25
value [2]  10/17 12/24
via [1]  10/2
view [5]
violation [2]  14/11 14/11
virtue [1]  15/12
vs. [3]  3/9 16/4 16/6

**W**

WEDNESDAY [1]  2/12
week [6]
weeks [1]  21/25
weight [1]  21/2
wife [1]  22/5
wonderful [1]  8/10
words [3]  13/24 15/1 15/8
work [3]  4/10 4/11 24/1
works [2]  24/1 24/5
worth [5]
written [1]  14/19
wrong [4]  13/10 17/1 19/3 19/4

**Y**

York [1]  6/14